452 F.2d 8
 78 L.R.R.M. (BNA) 3052, 66 Lab.Cas. P 12,234
 PACIFIC MARITIME ASSOCIATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL
NO. 54, Respondent.
 Nos. 26129, 26356.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 24, 1971.
 
 Dennis Daniels (argued), of Ernst & Daniels, San Francisco, Cal., for Pacific Maritime Assn.
 Vivian Miller (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington, D. C., Roy O. Hoffman, Director, NLRB, San Francisco, Cal., for National Labor Relations Bd.
 Norman Leonard (argued), of Gladstein, Leonard, Patsey & Andersen, San Francisco, Cal., for International Longshoremen's and Warehousemen's Union, Local No. 54.
 Before HAMLIN and WRIGHT, Circuit Judges, and CURTIS, District Judge.*
 HAMLIN, Circuit Judge.
 
 
 1
 This case involves a consolidation of two actions. In the first, Pacific Maritime Association (PMA) seeks review of a decision and order of the National Labor Relations Board, which order the Board seeks to apply against PMA in its cross-application for enforcement. In the second, the Board seeks enforcement of the same decision and order against Local 54, International Longshoremen's and Warehousemen's Union (ILWU).
 
 
 2
 Pursuant to a collective bargaining agreement, Local 54 and PMA had established a jointly operated hiring hall (joint hall) which was designated as the exclusive labor referral source for longshoremen in the Stockton, California, area. This agreement established a program of dispatch, under which class "A" union members were dispatched first, class "B" union members second, and a group of 580 nonunion "casuals" last, to fill whatever jobs remained.[1] Casuals were dispatched on a rotating basis to insure equitable apportionment of work among them; they were granted access to the joint hall facility on condition that they pay a pro rata share of expenses.
 
 
 3
 The discrimination complained of occurred when the joint hall dispatcher initiated a practice of calling the hiring hall of Local 54's sister union, Local 6 (Local 54 being a "longshoremen's" local, and Local 6 a "warehousemen's" local) and requesting that Local 6 unionists be sent to the joint hall for dispatch before Local 54 casuals were assigned any work. Local 6 was not a party to the PMA-Local 54 arrangement. At no time did Local 6 nonunion "permit men" benefit from this practice.
 
 
 4
 Subsequent to the filing of the initial charges against the union, this procedure was modified. Thereafter, the Local 6 dispatcher would stop at the joint hall in the morning and pick up dispatch slips for Local 6 men. Thus, these men were dispatched directly from the Local 6 hall and no longer appeared at the joint hall.
 
 
 5
 Charges were first filed against the Union alone on December 29, 1966. Subsequently, the charges were amended to include a charge that the union had threatened the initial complainant because he had filed the unfair labor practice charge. In April, 1967, the same discrimination charges were filed against PMA. The charges have also been amended to incorporate certain other casuals as discriminatees.
 
 
 6
 Uncontradicted testimony of the complainant before the Hearing Examiner revealed that the president of the Union had stated that consideration was given to Local 6 men because they were "union men * * * and will go out ahead of any casual people." There was further unrefuted testimony that the union president had made certain intimations to the complainant that economic and physical reprisals would be taken against him because he had gone to the National Labor Relations Board. Finally, the record before the Hearing Examiner revealed that the preference given Local 6 men was not based on any special skills or ability that they possessed; they were indiscriminately assigned to work that could have been performed by joint hall casuals.
 
 
 7
 Based on these facts, the Board adopted the Hearing Examiner's findings that the Union had violated sections 8(b) (2) and (1) (A) of the National Labor Relations Act and that the PMA had violated sections 8(a) (1) and (3) of said Act by jointly operating an exclusive job referral system in a discriminatory manner which encouraged membership in Local 6. The Board also found the union guilty of violating section 8(b) (1) (A) of the Act by threatening and coercing the complainant because he exercised his rights under the Act.
 
 
 8
 In seeking review of these determinations of the Board, PMA makes three basic contentions.
 
 
 9
 First, PMA argues that it did not know of the discrimination involved, and, in the absence of such knowledge, cannot be found guilty of violating the Act.
 
 
 10
 The Board has advanced the contention that once an employer assigns a union as its exclusive hiring agent, it is jointly liable for any discriminatory acts which occur, and cites Morrison-Knudsen Co. v. N.L.R.B., 275 F.2d 914 (2d Cir. 1960), cert. denied, 366 U.S. 909, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961) and N.L.R.B. v. H. K. Ferguson Co., 337 F.2d 205 (5th Cir. 1964), cert denied, 380 U.S. 912, 85 S.Ct. 898, 13 L.Ed.2d 798 (1965) to support this view.
 
 
 11
 PMA argues that these cases do not purport to affix absolute liability on the employer unless he actually knows of the activity, and notes that this was the holding of N.L.R.B. v. Master Stevedores Assn. of Texas, 418 F.2d 140 (5th Cir. 1969).[2]
 
 
 12
 However, in Morrison-Knudsen, the court explicitly stated, "regardless of the extent of their (employer) knowledge * * * an employer may not avoid liability for violations of the Act by the hiring hall when he has turned over to it the task of supplying the men to be employed." 275 F.2d at 917. (emphasis added).
 
 
 13
 In any case, we find that there was sufficient evidence of PMA's knowledge. In the first place, the hiring hall here was a joint venture, supervised by a committee comprised of PMA and Union representatives. Thus, PMA, "by reasonable diligence should have known." N.L.R.B. v. Houston Maritime Assn., 337 F.2d 333, 336 (5th Cir. 1964). In addition, we note charges were first filed against the Union in December, 1966, but not against PMA until April, 1967. Throughout that period the discriminatory system continued in effect. The charges against the Union should have put PMA on notice. See, e. g., N.L.R.B. v. Local 269, IBEW, 357 F.2d 51, 57 (3rd Cir. 1966).
 
 
 14
 PMA secondly suggests that Local 6 was the locus of the discrimination. Thus, the argument goes, the Local 6 practice of discriminating against its permit men is not susceptible to the "exclusive agent" analysis, since PMA employed many nonunion people from the joint hall.
 
 
 15
 This argument attempts to confuse the issue. The charges here are directed against PMA and Local 54 for discrimination in the operation of their joint hall. There is no charge against Local 6. At no time was Local 6 utilized independently as an original source of labor; referrals always came through the joint hall. The result was the same as if Local 6 unionists were dispatched directly from the joint hall (which they were, until the charge was filed).
 
 
 16
 Finally, PMA argues that Local 6 unionists were accorded only "temporal" priority in dispatch. This point has little merit. Whether jobs were allocated to Local 6 unionists before, after, or contemporaneously with dispatch of Local 54 casuals is of no consequence. Assignment of Local 6 men deprived the Local 54 casuals of those jobs. The record showed that on several occasions Local 6 unionists worked when Local 54 casuals did not.[3]
 
 
 17
 The Union, on the other hand, advances essentially the same argument that it placed before the Hearing Examiner, that discrimination was based on skill, not union membership, and that casuals lost work because of absenteeism.
 
 
 18
 From an examination of the record, it is clear that there is substantial evidence in support of the Board's conclusion that these contentions are without merit. The record showed no correlation between job assignments and special skills of Local 6 men. Moreover, it was established that the Local 54 complaining casuals possessed substantially the same skills. The record also established a pattern of regular attendance of the discriminatees at the joint hiring hall.
 
 
 19
 The Union does not contest the coercion and intimidation charge.
 
 
 20
 The Board's findings are shown to be supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Therefore, the Board's order to cease and desist from the found discriminatory practices, to make the named discriminatees whole for lost wages, and to post appropriate notices will be enforced.
 
 
 
 *
 The Honorable Jesse W. Curtis, Jr., United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 At no time has it been contended that this system of dispatching was an unfair labor practice
 
 
 [2]
 Local 190, Laborers' International Union, 167 NLRB 561 (1967), also relied upon by petitioner PMA, is not in point
 
 
 [3]
 The Trial Examiner found that from June 30, 1966, to April, 1967, Local 6 members were dispatched ahead of casuals from the Union Hall to approximately 1300 longshore jobs