John CARR, et al.,
Plaintiffs–Appellants,

v.

PACIFIC MARITIME ASS'N, et al.,
Defendants–Appellees.

Greg BROOKS, Judy Checkers, et al.,
Plaintiffs–Appellants,

v.

PACIFIC MARITIME ASS'N, et al.,
Defendants–Appellees.

Nos. 87–6137, 87–6497.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1988.

Memorandum Filed Dec. 7, 1988.

Memorandum Withdrawn March 17, 1989.

Decided May 21, 1990.

---

George W. Shaeffer, Jr., Silver, Kreisler, Goldwasser & Shaeffer, Newport Beach, Cal., for plaintiffs-appellants.

Robert Remar, Leonard, Carder & Zuckerman, San Francisco, Cal., for defendants-appellees, Intern. Longshoremen's and Warehousemen's Union and its Local 63.

J. Kevin Lilly, Gibson, Dunn & Crutcher, Newport Beach, Cal., for defendant-appellee, Pacific Maritime Ass'n.

George Shibley, Long Beach, Cal., for defendant-appellee, Local 13.

Before NORRIS, HALL and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

Applicants for registration as class B longshoremen and clerks seek damages and injunctive relief, claiming that the registration process was tainted by nepotism, favoritism and discrimination. The district court found that the applicants failed to exhaust contractual grievance procedures and that their failure was not excused. Plaintiffs appeal the district court's grant of summary judgment and dismissal of their action. We review the district court's grant of summary judgment de novo. *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986).

## I. FACTS

Plaintiffs are 128 casual longshoremen and clerks whose applications for registration as class B longshoremen or clerks in the Los Angeles area were rejected.[1] Defendants are the Pacific Maritime Association (PMA), an association of West Coast stevedoring, shipping and terminal companies; the International Longshoremen's and Warehousemen's Union (ILWU), the exclusive bargaining representative of longshoremen and clerks who work for PMA members; ILWU Local 13 (Local 13), the chartered, affiliated local of the ILWU for longshoremen in the Los Angeles area; and ILWU Local 63 (Local 63), the chartered, affiliated local of the ILWU for clerks in the Los Angeles area. Defendants are parties to the Pacific Coast Longshore Contract Document and the Pacific Coast Clerk Contract Document (the Contract), which govern the terms and conditions of employment for longshoremen and clerks.

This controversy arises out of the registration of approximately 387 class B longshoremen and clerks by defendants in late 1984. Approximately 22,250 applications were submitted for registration by September 26, 1984. Applications were scored by a Joint Registration Committee, a tripartite committee composed of representatives of the PMA, Local 13 and Local 63.

The first phase of the registration process was completed on May 4, 1985. The Coast Labor Relations Committee (Coast LRC), which issues rules governing the registration and grievance process, had established a ten-day grievance filing period to commence upon completion of the registration process. On May 6, 1985, notices were posted in the longshore, clerk and casual dispatch halls notifying individuals that the initial phase of the registration had been completed, and that appeals would be considered timely if received by the Joint Port Labor Relations Committee (Port LRC) on or before May 15, 1985. The Port LRC received 318 timely grievances.

On October 23, 1985, more than five months after the close of the grievance filing period, 109 unsuccessful registrants (the Balsley Group) filed their First Amended Statement of Grievance with the Port LRC. They alleged favoritism, nepotism, arbitrary scoring and coaching of applicants (non-section 13 Contract claims) and

1. Three groups brought suit: The Carr Group (109 unsuccessful Class B union registrants) filed suit on November 5, 1985; the Brooks Group (11 unsuccessful Class B union registrants) filed suit on January 15, 1986; and the Checkers Group (8 unsuccessful Class B union registrants) filed suit on March 24, 1986. These three actions have been consolidated on appeal.

discrimination on the basis of non-union membership (section 13 Contract claims) by the Joint Registration Committee. They also alleged violations of Local 13's and Local 63's duty of fair representation, and a breach of the collective bargaining agreement by all defendants.

Under the terms of the Contract,[2] the Port LRC resolves all non-section 13 claims. Its decision is final and binding on all parties, unless there is disagreement between the union and management members of the Port LRC, in which case an appeal to the Coast LRC is allowed. *See* Contract § 17.24.

Section 13 claims are processed pursuant to section 17.4 of the Contract. All section 13 claims must be filed within ten days of the alleged discriminatory incident. Contract § 17.41. The Port LRC has discretion to extend the deadline for filing section 13 claims up to six months from the date of the alleged discriminatory act "to prevent inequity." Contract § 17.411. The Port LRC's decision may be appealed to the Coast LRC, provided the request for review is made within seven days of the Port LRC's decision. Contract § 17.42. The Coast LRC's decision is further appealable to the Coast Arbitrator, again under the condition that the appeal be made within seven days of the Coast LRC's decision. Contract § 17.43. Neither the Port LRC, the Coast LRC nor the Coast Arbitrator can extend the latter two periods or the period for challenging non-section 13 claims.

On April 11, 1986, the Port LRC ruled that the Balsley Group's section 13 and non-section 13 claims were time-barred. The Port LRC also rejected the grievants' request that it extend the filing deadline for the section 13 claims to six months.

The Balsley Group appealed its section 13 claims to the Coast LRC on April 17, 1986.[3] On May 1, 1986, the Coast LRC held that the group's section 13 discrimination claim was time-barred. The Coast LRC also ruled that the Port LRC did not abuse its discretion by refusing to extend the filing period for the section 13 claims.

The Balsley, Brooks and Checkers Groups filed a consolidated appeal before the Coast Arbitrator in May 1986. The parties stipulated that the only issue before the Coast Arbitrator was the timeliness of their section 13 claims. District court proceedings were stayed pending the Coast Arbitrator's decision.

On January 15, 1987, the Coast Arbitrator held that the grievants' section 13 discrimination claims were time-barred. He found that the grievants either knew or should have been aware of allegations of nepotism, favoritism and discrimination in the registration process prior to the May 15, 1985, filing deadline. The Coast Arbitrator concluded that the allegations made in the October 23, 1985, amended grievance could have been raised in a timely manner. The Coast Arbitrator found that the Port LRC did not abuse its discretion in deciding not to extend the filing deadline for section 13 claims.

The district court granted summary judgment for defendants in all three actions.[4] The district court refused to excuse plaintiffs' failure to exhaust their contrac-

---

**2.** Section 11 of the Coastwise Registration Rules, adopted by the Coast LRC on August 10, 1984, provides that the grievance procedures set forth in the Contract "shall be the exclusive remedy with respect to any disputes involving registration or deregistration ... [of] persons working or seeking to work under this Agreement.... No other remedies shall be utilized by any persons with respect to any dispute involving registration or deregistration until the grievance has been exhausted." Coastwise Registration Rules, § 11 (August 10, 1984), quoted in David Balsley, et al., Arbitrator's Decision at 7 (January 15, 1987) (Kagel, Arb.).

**3.** Two other groups filed grievances with the Coast LRC, incorporating by reference the allegations made in the Balsley Group grievance. The Checkers Group filed on March 25, 1986; the Brooks Group filed on January 16, 1986. Neither group filed a group grievance with the Port LRC before pursuing their remedies with the Coast LRC. The grievances of both groups were found to be time-barred by the Coast LRC.

**4.** *See Carr v. Pacific Maritime Ass'n,* No. CV 85–7243–FFF (C.D.Cal., filed June 3, 1987); *Brooks v. Pacific Maritime Ass'n,* No. CV 86–345 FFF (C.D. Cal. Sept. 29, 1987); *Checkers v. Pacific Maritime Ass'n,* No. CV 86–1859 FFF (C.D.Cal. Sept. 29, 1987).

tual remedies and dismissed their claims for breach of collective bargaining agreements and for breach of the union's duty of fair representation under section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1982).[5]

## II. DISCUSSION

 A. As a general rule, members of a collective bargaining unit must first exhaust contractual grievance procedures before bringing an action for breach of the collective bargaining agreement. *See, e.g., Clayton v. UAW*, 451 U.S. 679, 686, 101 S.Ct. 2088, 2093–94, 68 L.Ed.2d 538 (1981). This requirement applies with equal force to claims brought against a union for breach of the duty of fair representation. *See Vaca v. Sipes*, 386 U.S. 171, 184–85, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967). Failure to utilize the grievance procedures, or to invoke them in a timely manner, bars grievants from pursuing remedies in court. *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). At a minimum, therefore, members of the bargaining unit must first turn to the grievance procedures for a remedy. *Id.* at 652–53, 85 S.Ct. at 616.

 Plaintiffs argue that they are excused from exhausting their contractual remedies because the alleged lack of neutrality of the Port LRC rendered resort to grievance process futile. *See Republic Steel*, 379 U.S. at 652, 85 S.Ct. at 616 (quoting *Steele v. Louisville & Nashville*

*Ry.*, 323 U.S. 192, 206, 65 S.Ct. 226, 234, 89 L.Ed. 173 (1944) ("employees should [not] be required to submit their controversy to 'a group which is in large part chosen by the [defendants] against whom their real complaint is made' ")); *see also Williams v. Pacific Maritime Ass'n*, 617 F.2d 1321, 1328 n. 13 (9th Cir.1980) (dicta), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981). We have held, however, that a plaintiff waives his right to claim bias on the part of the grievance committee unless he raises the objection when the committee convenes. *Sheet Metal Workers International Ass'n Local 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 746 (9th Cir.1985). This is the rule in several other circuits as well. *See e.g., Early v. Eastern Transfer*, 699 F.2d 552, 558 (1st Cir.), *cert. denied*, 464 U.S. 824, 104 S.Ct. 93, 78 L.Ed.2d 100 (1983); *Cook Industries, Inc. v. C. Itoh & Co., Inc.*, 449 F.2d 106, 107–08 (2d Cir.1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972); *United Steelworkers of America Local 1913 v. Union Railroad Co.*, 648 F.2d 905, 913–14 (3d Cir.1981).

In *Kinney*, plaintiffs attempted to overturn an unfavorable arbitration award on the theory that the grievance process was biased. We held that plaintiffs had waived their bias claim because they had not objected to the makeup of the arbitration board at the time of the grievance procedure. *Kinney*, 756 F.2d at 746. The rule of *Kinney* is easily extended to this case.[6]

---

5. The district court dismissed without prejudice claims by plaintiffs whose grievances were timely filed.

6. The dissent argues that this case is distinguishable from *Kinney* because "appellants are not signatories to the applicable collective bargaining agreement," and therefore "had no direct say in the establishment of procedures for selecting panelists who would hear and impartially decide their grievances." Dissent at 1323. This seems to us irrelevant. It will almost always be true that a grievant will not be a signatory to the collective bargaining agreement; by virtue of representation, individual union members rarely have much of a *direct* say in the procedures set up to arbitrate grievances. Surely the *Kinney* rule is not limited to signatories to the collective bargaining agreement; any grievant is capable of objecting to the composition of

an arbitration panel. *See e.g., United Steelworkers*, 648 F.2d at 913–14 (applying the rule to an individual union member); *Early*, 699 F.2d at 558 (same). Perhaps the dissent is referring to the fact that plaintiffs are not union members. It cannot be, however, that non-members of the union have greater rights to avoid grievance procedures than union members.

The dissent also contends that plaintiffs' statement of grievance to the Port LRC may be read as an implied objection to the neutrality of the Port LRC itself. Dissent at 1323–24. This, too, is irrelevant. Plaintiffs' filed their grievance over five months after the deadline. If, at the time of the original filing deadline, plaintiffs had reason to suspect the Port LRC was biased, plaintiffs could have filed their "implied" objections timely; if they did not suspect bias at that time, they had no reason not to file.

Here, plaintiffs failed to object in a timely manner to alleged bias in the Port LRC. Moreover, they did not attempt to use the grievance procedure within the specified time limits. Yet they come to court now claiming that such failure should be excused because of bias in the Port LRC. It would defy logic to hold that plaintiffs, like those in *Kinney,* who use a grievance procedure without objection waive their right to claim bias, while those, like the present plaintiffs, who offer no objection to the procedure *and fail to use it* are to be afforded the protection of the courts. To allow these plaintiffs to bring their bias claim would create perverse incentives to avoid grievance procedures that would undermine our traditional deference to private dispute resolution in labor relations. Therefore, because plaintiffs did not timely notify the Port LRC that they believed the grievance procedure was tainted, they cannot claim bias now.[7]

Appellant Nancy Davis presents a special case. She filed her grievance with the Port LRC before the close of the filing period. In her letter of April 24, 1985, to the Port LRC, Davis alleged, *inter alia,* nepotism, favoritism and coaching of favored applicants. The Port LRC rejected her claim without notifying her of her right to appeal any section 13 claims she might have presented. The Coast Arbitrator, in interpreting the Contract, apparently found that Davis had raised a section 13 claim, but that she had waived her right to appeal it by failing to appeal the Port LRC's decision to the Coast LRC within seven days. Although a Coast LRC rule requires the Port LRC to inform all grievants who allege section 13 claims of their right to appeal to the Coast LRC, *see* Letter from ILWU–PMA Joint Coast Labor Relations Committee to ILWU Locals and PMA Area Offices (July 18, 1979), we cannot overturn the Coast Arbitrator's interpretation of the contract or his application of the rules issued pursuant to it. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). We must therefore reject Davis' claim as well.

■ **B.** Plaintiffs next allege that their failure to exhaust their contractual remedies should be excused because of the inadequacy of the grievance processes and remedies. They argue that the grievance mechanisms are flawed because they do not provide for pre-hearing discovery, representation by counsel before the Port LRC, appointment of a special master by the Coast Arbitrator to control future registrations, or the award of attorney's fees to grievants who succeed before the arbitrator. None of these alleged flaws, however, prevented plaintiffs from at least attempting to invoke the contractual remedies in a timely manner.[8] At a minimum, grievants must present and prosecute their grievances through contractual procedures before complaining of the inadequacy of

---

7. Contrary to the dissent's assertions, we do not require that plaintiffs have "exhausted the grievance procedure," or that they "go through the[ ] entire" process. Dissent at 1324. To preserve their bias/futility claim, plaintiffs simply needed to notify the Port LRC in a timely manner that they believed the grievance procedure was biased so that the Port LRC might have an opportunity to act on that complaint.

8. The dissent argues that "[i]t was highly unreasonable to expect individuals to muster, in ten days and without any discovery, proof of pervasive nepotism and favoritism sufficient to prepare a grievance stating a claim for violation of the collective bargaining agreement." Dissent at 1325. But, under the collective bargaining

agreement, grievants aren't required to "muster proof"; the initial filing need only set out "the facts as to the alleged discrimination." Contract § 17.41. It is the job of the Port LRC to "investigate" all grievances. Contract § 17.124. Three hundred and eighteen other grievants apparently had no problem meeting the 10–day requirement. This group included *Carr* appellant Nancy Davis, whose timely filing alleged favoritism and nepotism.

Instead of filing timely, plaintiffs conducted an independent five-month investigation. As the dissent states, "the collective bargaining agreement neither required nor forbade" plaintiffs' investigation. Dissent at 1325. But the agreement did require that plaintiffs at least notify the Port LRC that they had a complaint.

those processes. *See e.g., Hines v. Anchor Motor Freight,* 424 U.S. 554, 563, 96 S.Ct. 1048, 1055–56, 47 L.Ed.2d 231 (1976) (grievant cannot "sidestep the grievance machinery ... unless he attempted to utilize the contractual procedures for settling his dispute with his employer"); *Beriault v. Local 40, Super Cargoes & Checkers, Int'l Longshoremen's & Warehousemen's Union,* 501 F.2d 258, 262 (9th Cir.1974). Thus, the assertion by plaintiffs that the grievance and arbitration procedures were inadequate is entirely speculative, since plaintiffs failed to avail themselves of those remedies in a timely manner.

■ **C.** We must also reject plaintiffs' claim that the Port LRC's refusal to extend the filing deadline for their section 13 discrimination claim and its "discouragement of appeals" amounts to a repudiation of the grievance procedure. The plaintiffs' ability to have a neutral arbitrator review the Port LRC's decision cures whatever bias there may have been in the Port LRC's decision-making process. *See Ritza v. Int'l Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 370 (9th Cir.1988) ("any hostility that may exist at the joint coast level is cured by the availability of neutral arbitration"). As already noted, the Coast Arbitrator determined that the Port LRC's decision not to extend the deadline was not an abuse of discretion. We must accord great deference to such findings by arbitrators acting pursuant to collective bargaining procedures. *See e.g., Misco,* 484 U.S. at 36–38, 108 S.Ct. at 370–71. As to the non-section 13 claims, the Port LRC had no authority to extend the filing deadline. Plaintiffs may therefore not complain that the Port LRC abused its discretion or acted with partiality in failing to extend those filing deadlines.

■ The Port LRC's failure to notify applicants of their right to appeal the Joint Registration Committee's decision when applicants' registration fees were returned does not constitute repudiation of any aspect of the contract. All applications contained a notice to applicants of their right to appeal the Joint Registration Commit-

tee's decision; no other notification was required.

■ Nor does plaintiffs' suggestion that "registration appeals were summarily reviewed and rejected by the Port LRC," Appellants' Brief at 47, establish that the Port LRC discouraged appeals. Indeed, the fact that numerous applicants successfully appealed the Joint Registration Committee's decision suggests that the Port LRC was more than a rubber stamp.

**D.** Plaintiffs also claim the union's alleged breach of its duty of fair representation excuses their failure to comply with the grievance procedures. Although plaintiffs claim that the union breached its obligation to "represent those in a designated unit, to serve their interest without hostility or discrimination, and to exercise its discretion with complete good faith, honesty, and to avoid arbitrary conduct," Appellants' Brief at 40, in essence their fair representation claim focuses not on the union itself but on the actions of the union members on the Joint Registration Committee and the Port LRC.

■ There are two situations in which a breach of the duty of fair representation excuses the exhaustion requirement: First, where "the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if ... the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance," *Vaca v. Sipes,* 386 U.S. at 185, 87 S.Ct. at 914 (emphasis original); second, where grievants allege a breach of the duty of fair representation with regard to negotiating the collective bargaining agreement. *See Williams,* 617 F.2d at 1328.

■ The district court correctly found neither exception applicable. *See Carr v. Pacific Maritime Ass'n,* No. CV 85–7243 FFF (C.D.Cal., filed June 3, 1987); *Brooks v. Pacific Maritime Ass'n,* No. CV 86–345 FFF (C.D.Cal. Sep. 29, 1987); *Checkers v. Pacific Maritime Ass'n,* No. CV 86–1859 FFF (C.D.Cal. Sep. 29, 1987). The first exception to the exhaustion requirement is inapplicable, because the grievants can uti-

lize the contractual remedy process without the help or approval of the union. Thus, this case is distinguishable from those where the union has assumed sole responsibility of preparing and presenting the grievant's claim. *See Vaca v. Sipes,* 386 U.S. at 185, 87 S.Ct. at 914. Nor is this a case where the grievants are seeking a remedy not available through the grievance procedure, such as modification of the contract. *See Beriault,* 501 F.2d at 266. Plaintiffs are not challenging some aspect of the registration process that cannot be corrected under existing grievance procedures; instead, they merely allege that certain union representatives on the Joint Registration Committee and the Port LRC unfairly reviewed their applications. This allegation neither excuses plaintiffs' failure to file their grievances on time or to state their complaints with specificity, nor justifies their decision to sidestep the grievance process.

**E.** We do not consider plaintiffs' argument that their failure to exhaust contractual remedies is excused because of delays in the grievance process, as that allegation was not raised in the complaint. Nor could they have raised such a claim when their suits were filed, as they sought judicial relief either before or shortly after filing their group grievances. The Carr Group brought suit on November 5, 1985, eleven days after filing its amended grievance before the Port LRC; the *Brooks* action was filed on January 15, 1986, one day before that group submitted its grievance to the Coast LRC; the *Checkers* action was filed on March 24, 1986, one day before that group filed its group grievance before the Coast LRC. Thus, plaintiffs base their assertion of unreasonable delay on what occurred after, rather than prior to, their resort to the district court.

For the same reasons, we do not consider Wasserman's and Schreiner's claims that the Port LRC's delay in deciding their section 13 claims excuses their failure to exhaust the grievance procedures. In July 1985, the Coast LRC remanded Wasserman's section 13 grievance for further proceedings before the Port LRC. On October 3, 1985, the Port LRC considered his individual grievance. One month later, Wasserman filed suit in district court. *See Carr v. Pacific Maritime Ass'n,* No. CV 85–7243–FFF (C.D.Cal. Nov. 5, 1985). Schreiner brought suit less than four months after filing his second complaint with the Port LRC. *See Carr v. Pacific Maritime Ass'n,* No. CV 85–7243–FFF (C.D.Cal. Nov. 5, 1985). Schreiner's and Wasserman's claims are based on what occurred after, rather than prior to, the commencement of this action. The district court was therefore correct in dismissing both Wasserman's and Schreiner's claims without prejudice and allowing them to pursue their contractual remedies.

AFFIRMED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting:

The federal courts have long followed a policy of giving great deference to private dispute resolution in labor relations. That policy is generally a sound one, but private resolution has its limits. As the United State Supreme Court noted in *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976), "Congress has put its blessing on private dispute settlement arrangements provided in collective agreements, but it was anticipated, we are sure, that the contractual machinery would operate within some minimum levels of integrity." In the factual situation presented by this appeal, the private law system appears to have failed in its fundamental function of dispensing industrial justice. This case is thus an appropriate one for judicial intervention.

I

Appellants have made quite a compelling and troubling showing that the 1984–85 registration process was tainted with nepotism and favoritism: perhaps 309 of the 410 successful longshore registrants (out of 22,250 total applicants) had either family or other close connections with union or PMA officials, or with union members. Allegations regarding the composition of the Port LRC that conducted the challenged

registration process, and then decided appellants' and the individual grievances that followed, are even more troubling: several of the union and PMA representatives to that committee themselves had relatives among the successful applicants.

Appellants also persuasively argue that the informal grievance and arbitration procedures, conducted within an extremely constricted time frame and without provisions for any meaningful discovery, were wholly inadequate to the task of fairly adjudicating the individual or class claims of nepotism and favoritism that arose out of the 1984–85 registration. Appellants' showing is sufficient to raise serious questions of bias in, and futility of, resort to the grievance and arbitration process.

It is generally true that employees must *attempt* to exhaust the grievance and arbitration procedures established in a collective bargaining agreement prior to bringing an enforcement action in district court under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965); *Vaca v. Sipes,* 386 U.S. 171, 184–85, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967); *Beriault v. Local 40 Super Cargoes & Checkers of ILWU,* 501 F.2d 258, 262 (9th Cir.1974). This exhaustion requirement is, however, "subject to a number of exceptions for the variety of situations in which doctrinaire application of the exhaustion rule would defeat the overall purposes of federal labor relations policy." *Glover v. St. Louis–San Francisco Ry. Co.,* 393 U.S. 324, 329–30, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969); *Williams v. Pacific Maritime Ass'n.,* 617 F.2d 1321, 1328 n. 13 (9th Cir.1981), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981).[1]

In *Williams,* 617 F.2d at 1328–29 n. 13, we noted that there are several situations in which an employee's failure to completely exhaust contractual remedies will be excused: (1) where the adjudicating body in the private law system lacks neutrality because it was chosen by the very defendants against whom the employee's real complaint is made, *Glover,* 393 U.S. at 330–31, 89 S.Ct. at 551; (2) where plaintiff's attempt to use the grievance process is not successful because the process is not "plain, speedy, and adequate," *see, Maddox,* 379 U.S. at 652–53, 85 S.Ct. at 616; and (3) where the judicial relief requested is beyond the limited powers of the arbitrator to grant, *Beriault,* 501 F.2d at 266.

## II

Appellants' most compelling argument concerns the first exception, namely, that bias of the Port LRC makes the exhaustion of administrative procedures futile. Futility due to lack of neutrality can arise where the union and management are in collusion. Submission to administrative procedures "would entrust representation of the complaining employee to the very union he claims refused him fair representation...." *Lusk v. Eastern Products Corp.,* 427 F.2d 705, 708 (4th Cir.1970) (plaintiffs alleged that the agreement bargained for between union and management deprived them of proper wages; lower court dismissed on theory that defendants were required to submit complaint to arbitration, appellate court would have reversed on that theory but affirmed on another theory). A grievance and arbitration procedure, "administered by the union, by the company, or both to pass on claims by the very employees whose rights they have been charged with neglecting and betraying," could not be trusted to remedy discrimination practiced by union and employer in concert. *Glover,* 393 U.S. at 330–31, 89 S.Ct. at 551. *See also, Battle v. Clark Equipment Co.,* 579 F.2d 1338, 1345–46 (7th Cir.1978) *overruled on other grounds,* 679 F.2d 685 (7th Cir.1982) (employees alleged that their signatures to a modification to the collective bargaining agreement were fraudulently obtained, court ruled that summary judgment could not be sus-

---

1. Though this exception is a judge-made one, it should also be remembered that the exhaustion requirement itself is a judge-made requirement, not one mandated by section 301 or the collective bargaining agreement.

tained on the ground that appellants failed to exhaust administrative remedies); *Fulton Lodge No. 2 v. Nix*, 415 F.2d 212 (5th Cir.1969), *cert. denied*, 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972) (appellant, who had been fired, was not required to exhaust administrative remedies which dictated that he bring unfair practice charges before, first, the very person who fired him, and second, the board whose member he had accused of misconduct).

In the instant case, appellants present a plausible argument showing a similar type of futility due to collusion between union and management to engage in nepotism and favoritism during the registration process. The registration process is conducted by the Port LRC, which is composed of representatives of the union and management. If appellants' allegations are true, both union and management members of the Port LRC panel that actually heard and rejected appellants' group grievance had close relatives who were successful registrants in the 1984–85 registration procedures.[2] Furthermore, the Port LRC not only controls the registration process, but also decides appeals regarding its own registration decisions. Any pursuit of the nepotism and favoritism claims through the Port LRC would require Arian and Young (and any other LRC members in a like situation[3]) to concede their own misconduct. As we stated in *Williams*, "[i]t is unlikely that such persons could be entirely fair and impartial. This lack of neutrality in the adjudicating bodies renders exhaustion of remedies futile." 617 F.2d at 1329, n. 13.

## A

Apparently, the majority recognizes that the Port LRC may have been biased in its review of the group registration grievance. However, they decline to address the merits of the appellants' bias argument, denying the appellants access to federal court solely because the appellants' attempt to file a registration grievance was untimely, no matter how badly tainted with bias the grievance procedures may have been. I do not read our precedents as requiring such a harsh application of the exhaustion requirement.

The majority holds that appellants "waived" their right to claim bias on the part of the Port LRC by failing to raise the objection when the committee convened. The case on which they rely, *Sheet Metal Workers International Association Local #420 v. Kinney Air Conditioning Co.*, 756 F.2d 742 (9th Cir.1985), simply does not compel such a conclusion.[4] *Kinney* was an

---

**2.** For example, when the Port LRC met on October 16, 1985, to hear appellants' grievances, David Arian, President of Local #13, sat as committee chair; Charles Young was present to represent management. During the 84–85 registration, Arian's sister and Young's mother and girlfriend were registered.

**4.** Such a conclusion is also not mandated by the other three circuits which the majority claims have similar rules. *Majority opinion* at 1317. The cases cited all involve appellants who went through an arbitration process without objecting until they received an adverse ruling. Then they complained in federal court about bias situations which they knew of prior to proceeding with the arbitration. Such situations are different from the instant case where appellants claim that an attempt to file a grievance would have been fruitless. *See Early*, 699 F.2d at 558

**3.** Other members of the Port LRC who reviewed the grievances and who also had relatives registered are as follows:

| Name | Affiliation | Relatives Registered |
|------|-------------|---------------------|
| D. Bark | ILWU #63 | 2 sons |
| H. Kazmark | ILWU #63 | 5 family members |
| A. Luera | ILWU #13 | 7 family members |
| J. McCoy | ILWU #13 | 1 family member |
| R. Ortega | ILWU #13 | 3 family members |
| G. Peyton | ILWU #63 | 2 family members |

(dismissed employee should have objected at hearing to seating of local union president when employee feared president would be biased due to employee's past participation in dissident union groups); *Cook Industries*, 449 F.2d at 107–08 (appellant cannot remain silent during arbitration when he knows that one of four arbitrators is employed by a competitor and then raise the issue when an adverse ruling is received); *United Steel Workers*, 648 F.2d at 913–14 (petitioner cannot wait until second remand to challenge

action brought in federal court by a union to enforce an arbitration award that was entered against an employer after an adjudication on the merits of the union's contract claim. The employer claimed the award should be vacated due to the partiality of the arbitration panel. We rejected Kinney's bias argument because the employer was a party to the agreement which established the arbitration procedure, because the panel members' financial interest in the outcome of the proceedings were known to Kinney before the hearing, and because Kinney failed to object to the selection of the panel members at the time they were seated. *Id.* at 746.

*Kinney* does not rule on when a party may be *excused* from exhausting the grievance procedure before filing in federal court. Rather, the petitioners in *Kinney* had exhausted the grievance procedure and were suing to vacate the arbitrator's award. The court was unwilling to allow the petitioners, who had willing gone through the entire arbitration hearing without complaint of partiality, to make this argument for the first time in federal court, as a way of circumventing the arbitrator's adverse decision.

The instant case is distinguishable from *Kinney* in several important respects. First, appellants are not signatories to the applicable collective bargaining agreement. Unlike the employer in *Kinney*, they had no direct say in the establishment of procedures for selecting panelists who would hear and impartially decide their grievances, and for otherwise ensuring that longshore registrations were conducted in

conformity with the substantive terms of the agreement. In further contrast to *Kinney*, appellants never obtained a determination on the merits of their contract claims. It cannot be said of appellants, as it could of the employer in *Kinney*, that they came to federal court seeking a redetermination of issues decided adversely to them in the private system of dispute resolution.

Furthermore, appellants in the instant case implicitly *did* raise their objection to having members of that body adjudicate their grievance. By alleging particular family connections between successful registrants and PMA and union officials, members, and employees, the appellants' objection to the Port LRC's lack of neutrality appeared on the face of the grievances. Thus, appellants have preserved their right to claim bias on the part of the Port LRC. Appellants' failure to timely file their grievance is explained by their belief that the Port LRC would not have given them a fair hearing and their lack of pertinent information. The appellants knew that many of the Port LRC members were biased. In fact, there has been a long history of court actions against the Pacific Maritime Association and the ILWU on just these grounds.[5] Because the appellants were unaware of the identities of the particular Port LRC members who were to hear their cases, they were unable to collect evidence in a timely fashion. *See* section III of this dissent.

The majority's puzzling interpretation of *Kinney* seems to suggest that plaintiffs may be excused from the requirement that

---

the composition of the original hearing board that investigated his dismissal from his employment).

**5.** This is the twelfth time allegations of bias by the ILWU and the Pacific Maritime Association have come before this court. *See Ritza v. ILWU,* 837 F.2d 365 (9th Cir.1988) (per curiam); *Graybeal v. ILWU,* 760 F.2d 275 (9th Cir.1985) (slip opinion); *Scott v. Pacific Maritime Ass'n.,* 695 F.2d 1199 (9th Cir.1983); *Williams v. Pacific Maritime Ass'n.,* 617 F.2d 1321 (9th Cir.1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *Gibson v. Local 40, Supercargoes and Checkers, ILWU,* 543 F.2d 1259 (9th Cir.1976); *NLRB v. ILWU,* 514 F.2d 481 (9th

Cir.1975); *Beriault v. Local 40, Super Cargoes and Checkers, ILWU,* 501 F.2d 258 (9th Cir. 1974); *Griffin v. Pacific Maritime Ass'n.,* 478 F.2d 1118 (9th Cir.1973) (per curiam), *cert. denied,* 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973); *Pacific Maritime Ass'n. v. NLRB,* 452 F.2d 8 (9th Cir.1971); *Local 13, ILWU v. Pacific Maritime Ass'n.,* 441 F.2d 1061 (9th Cir.1971) *cert. denied,* 404 U.S. 1016, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972); *Alexander v. Pacific Maritime Ass'n.,* 434 F.2d 281 (9th Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1254, 28 L.Ed.2d 545 (1971); *Williams v. Pacific Maritime Ass'n.,* 384 F.2d 935 (9th Cir.1967), *cert. denied,* 390 U.S. 987, 88 S.Ct. 1181, 19 L.Ed.2d 1290 (1968).

they file their registration grievances with the Port LRC because of that committees' bias against such claims, but that they would remain subject to a separate requirement that they present their bias "claim" in that forum before proceeding to federal court with a section 301 action. The majority's argument suggests that because the longshoremen failed to complete this latter step, they waived their right to object to the bias of the board. This interpretation would completely emasculate the bias/futility exception. If the longshoremen had filed a timely claim, they would not need the exception to the exhaustion requirement (for they would have successfully exhausted the grievance procedure). The underlying premise of the exception is that to force the plaintiffs to file with a biased board and go through their entire procedure is a waste of time and money, merely delaying their entry into federal court.[6] We should not read *Kinney* so as to effectively overrule *Glover*. Thus the appellants should be excused from failing to meet the 10–day filing deadline, and indeed from filing at all, because it would have been a futile act to submit a nepotism grievance to a biased Port LRC panel on which both union and management representatives had engaged in the cronyism of which the appellants complained. It is unlikely that if appellants had filed their appeal within ten days, the LRC would have found that it was, indeed, selecting registrants unfairly.

## B

I would require the district court to hold an evidentiary hearing (or at least consider affidavits submitted by the applicants[7]) on the issue of the potential bias of the port LRC regarding plaintiffs' non-section 13 claims. In this manner, only meritorious claims of futility of exhaustion due to bias will reach the federal courts. Thus I would remand this case for a judicial finding as to whether the bias of the Port LRC made filing a grievance with them futile. If the judge finds that this exception to the exhaustion requirement has been proven by the plaintiffs,[8] I would allow them to file in federal court. If the plaintiffs fail to prove that the Port LRC was biased, the judge should then dismiss the complaint.

## III

Appellants' second argument for why they should be excused from exhausting

---

**6.** The attempt to exhaust contractual remedies made by petitioners in *Glover* consisted simply of informal complaints to the company regarding discrimination; they never utilized the grievance procedure by filing a formal complaint with the union or the company. In the instant case there have been at least as many complaints of bias against the Pacific Maritime Association and the International Longshoremen's and Warehousemen's Union, as evidenced by the long list of lawsuits (including this one) filed against them on this ground. *See* n. 5, above. Additionally, appellants herein attempted to comply by filing their claims five months after the occurrence (there is no time limit in the collective bargaining agreement as to non-section 13 claims, and the Port LRC could have granted a 6–month filing extension on the section 13 claims).

*Ritza* also accepts the proposition that there are exceptions to the exhaustion requirement, making no mention of a requirement that the petitioner first "attempt" (but presumably fail) to utilize the grievance procedure. Rather, the point of the exception is that the plaintiff does not have to fulfill the *Maddox* requirement of first attempting to use the grievance procedure. 837 F.2d at 370.

Thus, if plaintiffs fit within the bias/futility exception, they are excused from the requirement that they seek relief in the grievance and arbitration process, whether in a timely or untimely fashion.

**7.** In the instant case the judge made no factual finding as to whether the panel was actually biased, ruling instead that *Kinney* mandated dismissal on the grounds that petitioners waived their bias objection by not presenting it to the LRC.

**8.** Because I do not command a majority of this panel, I will not delineate the standard of proof that the plaintiffs would be required to satisfy. However, there are a number of options, including requiring the plaintiff to show a prima facie case of bias so as to get past summary judgment; having them prove bias by a preponderance of the evidence; or requiring them to show bias by clear and convincing proof. If they make only a prima facie showing, they will have to prove bias at trial. I believe an argument can be made for requiring clear and convincing proof in an evidentiary hearing before trial, in order to further the policy of private dispute resolution in the employment context, except where this machinery breaks down.

their contractual remedies is that the grievance process is inadequate. Unlike the bias/futility exception (*see* n. 6, supra) this exception does, in the normal situation, require that appellants make some attempt to implement the procedures and find them inadequate. *See Maddox,* 379 U.S. at 653, 85 S.Ct. at 616.[9]

### A

It is undisputed that appellants *attempted* to follow contractual procedures for obtaining relief on their group grievance by filing before the discretionary six-month deadline for section 13 grievances. The majority summarily dismisses plaintiffs' attempt because their grievance wasn't filed within the 10–day filing period. It was highly unreasonable to expect individuals to muster, in ten days and without any discovery, proof of pervasive nepotism and favoritism sufficient to prepare a grievance stating a claim for violation of the collective bargaining agreement.[10] Instead, appellants diligently pursued such proof through the informal channels of discovery before filing their "group grievance" in October 1985, well within the six-month period allowable at the discretion of the Port LRC.[11] Given the potentially hostile forum to which appellants were initially

required to present their proof, I would hold that their attempt to pursue contractual remedies was sufficient to satisfy the *Maddox* requirement that grievants must generally *attempt* to use the administrative grievance process before asking for a judicial declaration of its inadequacy.[12]

The majority treats appellants' unsuccessful attempt as if it were equal to no attempt and states that appellants are barred from federal court because "grievants must present and prosecute their grievances through contractual procedures before complaining of the inadequacy of those processes" and appellants have not completed such processes. (*Majority opinion* at page 1318–19). They rely on *Hines,* 424 U.S. at 563, 96 S.Ct. at 1055, and *Beriault,* 501 F.2d at 262, to support their assertion. I do not read these two cases to preclude an exception in the instant case.

The *Hines* case contains absolutely no discussion of what the "attempt" must consist of, as the appellant in *Hines* had fully exhausted the grievance procedure, and obtained an adverse administrative decision. The court allowed the federal suit, despite a final arbitration decision on the merits, because the grievance procedure and arbi-

---

**9.** *Maddox* was decided prior to *Glover.* It is only logical that for the inadequacy exception the petitioner must attempt to implement the procedures before finding them inadequate, while with the futility exception such an attempt would be useless.

**10.** Details of the identities of those registered was not known during the 10–day appeal period; identities of those individuals who would hear appeals was not known; thus the specific family connections could not be known during the 10–day period. The information regarding family connections of those registered was not easily obtained because the Port LRC has never published, or made available to anyone other than union or PMA officials, a list of applicants who were registered during the 1984–85 registration process. Appellants gathered information by interviewing a substantial number of people over a long period of time.

Of course, the collective bargaining agreement neither required nor forbade appellants' investigation. However, the fact that they felt the need to conduct an independent investigation indicates that, although they knew that grievances were supposed to be filed within the

10–day period, they believed it would have been futile to proceed before a biased panel of the Port LRC without rock-solid and compelling proof of a violation of the collective bargaining agreement.

**11.** It is important to note that there is *no time limit* stated in the collective bargaining agreement for filing non-section 13 grievances.

The Coast LRC, apparently with the consent of union representatives, established the ten-day period for grievances arising out of the 1984–85 registration. It may not have been, and the Coast Arbitrator concluded it was not, an abuse of discretion to refuse to apply the six-month limitations period to appellants' section 13 claims. Note, however that that was the *only* issue presented to the neutral arbitrator. Whether appellants' non-section 13 claims were timely filed is a separate issue that was decided only by the Port LRC and (implicitly) by the district court.

**12.** The plaintiff in *Maddox* made no attempt to use the 3–step administrative grievance procedure to recover severance pay. Instead, three years later, he filed an action in federal court.

tration had been inadequate. This inadequacy stemmed from the union's failure to even minimally investigate the theft charges against the appellee, which later information revealed to be false. The court held that "[a]s is the case where there has been a failure to exhaust, however, we cannot believe that Congress intended to foreclose the employee from his § 301 remedy otherwise available against the employer if the contractual processes have been seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines*, 424 U.S. at 570, 96 S.Ct. at 1059.[13]

Likewise in *Beriault* the Court again noted the general rule that employees must attempt to exhaust the grievance arbitration procedure, but goes on to note that "[u]nder certain circumstances, however, an employee may obtain judicial review of his breach-of-contract claim despite his failure to pursue contractual remedies." *Beriault*, 501 F.2d at 262. In Beriault the plaintiffs made *no real effort* to prosecute their grievance. *Id.* These plaintiffs failed to present any evidence to support their grievance at a hearing before the joint Port Labor Relations Committee. Plaintiffs were invited to return and present additional evidence at a later time, but again failed to do so. Plaintiffs' actions in *Beriault*, thus, cannot be said to be in any way similar to the appellants' actions in the case at bar. The appellants in the instant case made every reasonable attempt to gather and present evidence of bias, but the Port LRC refused to hear it. Further, the Port LRC had discretion to allow plaintiffs' grievances to be filed for a period of up to six months. Considering the difficulty of obtaining evidence, plaintiffs' good faith effort to file their grievance should have been allowed.

**B**

Furthermore, unlike the majority, I would not reject the appellants' argument that their failure to exhaust administrative remedies should be excused because the grievance procedures are subject to unreasonable delays. As far as we can tell, at the time this appeal was filed, those members of the appellant classes who timely filed individual grievances alleging favoritism and nepotism were still awaiting a decision by the Port LRC. Certainly the majority would not expect appellants to sit on their contract rights until an "unreasonable" period of time had elapsed, and risk running afoul of the statute of limitations for a court action. I would accept the appellants' argument about unreasonable delays in the private law system at least insofar as it illuminates the fundamental procedural inadequacy of the grievance and arbitration procedure to deal with a large class of related grievances arising out of an allegedly discriminatory registration process.

**IV**

The majority further believes that even if the Port LRC was biased, or the grievance procedures were inadequate, any such bias or inadequacy was cured by having an independent arbitrator available at the end of the grievance and arbitration process. I recognize and concede the validity of this argument with respect to the section 13 claims. *See Ritza v. Int'l. Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 370 (9th Cir.1988). However, independent arbitration was *not* available to appellants for their non-section 13 claims of favoritism (nepotism) and bad faith in the registration and employment of longshore workers and clerks.[14] Thus these claims are not barred by the *Ritza* analysis.

---

**13.** In *Hines* there was no conspiracy between the union and the employer. The employer honestly believed the employee was stealing, the union just failed to adequately investigate the charges. There was no bias on the part of the arbitration hearing committee, thus the futility/bias exception was not applicable. Yet the court allowed petitioner to file in district court under section 301.

**14.** Independent arbitration is available only for section 13 claims, by appeal from the Port LRC to the Coast LRC, and then to the Coast Arbitrator. In the case of non-section 13 grievances, the Port LRC is the sole and final arbiter.

V

Appellants' showing, with respect to both the registration process and the procedures for guaranteeing that registration is conducted in accordance with the terms of the collective bargaining agreement, is sufficiently troubling as to indicate that this is, regrettably, one of those rare cases in which the private law system has broken down. It would have been a futile act to submit a timely grievance based only on rumors and speculations for investigation and decision to a biased Port LRC panel on which both union and management representatives had what appears to be a serious conflict of interest. The private machinery for dispensing industrial justice appears to have broken down in this case. If appellants can prove bias, I would excuse them from exhausting the contractual grievance procedures, and allow them to proceed with their proof on the merits of their group grievance. Thus I would REVERSE AND REMAND.