Nick **MARINO**, Plaintiff–Appellant,

v.

**WRITERS GUILD OF AMERICA, EAST, INC.; Writers Guild of America, West, Inc.; Francis Ford Coppola; and Mario Puzo, Defendants–Appellees.**

No. 91–56497.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1993.

Decided May 12, 1993.

Gary E. Gans, Kenoff & Machtinger, Los Angeles, CA, for plaintiff-appellant.

Julius M. Reich, and J. David Sackman Members of Reich, Adell & Crost, A Professional Law Corp., Doreen Braverman, Cynthia R. Saffir, Writers Guild of America, West, Inc., Los Angeles, CA, for defendants-appellees.

Before: WALLACE, Chief Judge, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Nick Marino appeals the district court's summary judgment in favor of the Writers Guild of America ("WGA"), Francis Coppola and Mario Puzo in Marino's action seeking to vacate an arbitration award. WGA, as arbitrator, awarded screenwriting credit for "Godfather III" to Coppola and Puzo, and not to Marino and his cohort, Thomas Wright. Marino contends that the arbitration procedures used to determine the screenwriting credit were fundamentally unfair. Marino also argues that WGA violated its duty of fair representation by adopting the arbitration procedures and by failing to follow those procedures. Finally, Marino challenges the district court's denial of his request to discover the identities of the arbitrators. We affirm.

## BACKGROUND

The WGA is a labor union which was certified as the collective bargaining representative of screenwriters in the movie industry. Marino has been a WGA member since 1985. Pursuant to a collective bargaining agreement between WGA and the employers of writers in the movie industry, WGA determines which writers will receive screen credit for the writing of a screenplay. Both economic benefits and the writer's status in the industry are affected by the receipt of screen credit. Absent the rights set forth in the collective bargaining agreement, the power to allocate credits would be in the hands of the movie producers.

A portion of the collective bargaining agreement titled "Theatrical Schedule A, Theatrical Credits," sets forth the general rules of credit determination. The procedures for arbitration of credit disputes are set out in WGA's "Credits Manual." They are not part of the collective bargaining agreement, but are approved by WGA's board of directors and by vote of its membership. According to the Credits Manual, the arbitration has three phases.

What we will call the first phase is a procedure through which common factual disputes can be resolved. If there are disputes as to "authenticity, identification, sequence, authorship or completeness of any literary material to be considered" a special committee conducts "a hearing at which all participating writers may present testimony and documentary evidence." Manual, Credit Determination Procedure (CDP) § D.4. That committee's factual determination is binding and forms a part of the basis of the material that goes to those who conduct the second phase of the process.

The second phase of the process is conducted by the use of three individuals, called arbiters. Unlike the decision makers in the first phase, the arbiters do not hear oral testimony or argument. They read and cogitate. Their task is to decide who should get screen credit for the screenplay. Their names are kept confidential from the public, the participating writers, and even from one another. CDP § D.1. Each arbiter makes this difficult decision on creativity in isolation and based upon written materials. Those are materials submitted by the film company and they include "all material written by participants as well as ... source material." CDP § D.3. The participating writers are encouraged to review that material and may ask that appropriate materials be added. A participating writer may also submit a position statement for the purpose of helping the arbiters in their consideration of the written materials. Id. Writers are encouraged to do so. Each arbiter then makes a decision and notifies the Credit Arbitration Secretary. A majority decides the question. After the arbiters have made their decision, the participating writers are informed and the third phase becomes available.

The third phase is a review procedure. Within twenty-four hours of notification of the credit determination, any of the writers involved may request a review by a Policy Review Board ("PRB"). CDP § D.5. The PRB's scope of review is limited to determining whether there has been "any serious deviation from the policy of the Guild or the procedure as set forth in this Manual." More specifically, the PRB may consider questions involving dereliction of duty on the part of the arbiters, or any of them, any use of undue influence upon the arbiters, any misinterpretation, misapplication, or violation of WGA policies, and any "[i]mportant new written material" which was, for valid reasons, not previously available. Id. The PRB has the authority to direct the original three arbiters to reconsider the case or to order a new proceeding. The entire arbitration process must occur within 21 business days. If it does not, the producer's own selection may become final.

In 1985, Marino and Wright wrote an adaptation of literary material, referred to as a treatment, for "Godfather III," which Paramount Pictures Corporation ("Paramount") purchased.[1]

Paramount hired Marino to write a motion picture script, or screenplay, based on the treatment. Marino completed the screenplay in 1985, but Paramount chose not to produce it at that time.

In 1987, Marino wrote a second treatment and sent it to executives at a production studio owned by Coppola and related to the prior "Godfather" pictures. The production studio neither solicited nor purchased Marino's 1987 treatment. In 1989 and 1990, Coppola and Puzo co-wrote a screenplay for "Godfather III." The movie was produced and completed in 1990.

Before the movie was distributed, Marino was notified that WGA would be conducting an arbitration to determine the writing credits for "Godfather III," pursuant to the collective bargaining agreement. Accordingly, Marino, Coppola and Puzo submitted written materials and statements for the arbiters' review.[2] On November 5, 1990, the Arbitration Secretary informed Marino that Coppola and Puzo would receive sole writing credit. Marino requested a hearing before the PRB where he objected to the arbitration proce-

---

1. Wright is not an appellant and was not a plaintiff in the district court. Thus, we will generally refer to Marino only, even though Wright participated in the arbitration itself.

2. Although materials from other writers were submitted to the arbiters, only Marino, Coppola and Puzo were seeking credit.

dure. The PRB telephoned the three arbiters and presented Marino's allegations to them. The PRB discovered that one arbiter had not read Marino's 1985 treatment. That arbiter was sent the 1985 treatment for review, and the arbiter then reaffirmed the prior conclusion. In a letter dated November 21, 1990, the PRB informed Marino that a new arbitration was unnecessary and that the arbitration decision was final.

Marino then filed this action in state court in which he sought to vacate the arbitration award and to obtain declaratory relief. The action was removed to district court on grounds that the proceedings were governed by a collective bargaining agreement and preempted by federal labor law. WGA moved for summary judgment as did Marino. On October 25, 1991, after a hearing, the district court granted WGA summary judgment.

### JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1337, and we have jurisdiction under 28 U.S.C. § 1291.

The granting of summary judgment is reviewed de novo. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir. 1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). This court, viewing the evidence in the light most favorable to the opposing party, must determine whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

### DISCUSSION

Marino makes a number of attacks upon the arbitration procedures in general and upon their particular application to this case. A number of those revolve around his claim that it is fundamentally unfair to keep the identities of the arbiters confidential. That has the potential, he says, for concealing bias. Moreover, the result is that he cannot appear before them or cross examine witnesses before them. As we will explain,

Marino waived the right to mount this group of attacks.

He also asserts that the procedures were applied to him in an improper manner. He claims that he was refused the right to have the participating writers remain anonymous, that he was prevented from submitting what he deemed to be relevant evidence, that he was unable to see the other writers' written submissions, that the arbiters considered evidence that they should not have, and did not consider evidence that they should have.

### A. *Waiver; the Anonymity Claims.*

Arbitration is a favored method for the resolution of disputes, particularly in the labor area. *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). It is undoubtedly true that all notions of procedural fairness cannot be jettisoned simply because the parties have agreed to arbitrate. *See Sunshine Mining Co. v. United Steelworkers of Am.*, 823 F.2d 1289, 1295 (9th Cir.1987). However, because arbitration is contractual, rather than imposed by law, what we have come to see as the hallmarks of judicial justice are not necessarily required in arbitral justice. *See id.; Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1063–64 (9th Cir.1991). One reason is that arbitration can take account of unique problems. Arbitration can supply high-powered expertise to a particular and narrow area—such as deciding who should get credit for creating an imaginative work. At the same time, it can supply unique ways for avoiding the kinds of biases and pressures that judges are all too aware of. Lifetime appointments help insulate federal judges from those vices; arbitration procedures may offer other ways.

If arbitration is to work, it must not be subjected to undue judicial interference. *See* 9 U.S.C. § 10; *Stead Motors v. Automotive Mach. Lodge No. 1173*, 886 F.2d 1200, 1204–09 (9th Cir.1989) (en banc), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). Moreover, parties must be encouraged, nay required, to raise their complaints about the arbitration during the arbitration process itself, when that is possible.

■ Thus, it is well settled that a party may not sit idle through an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse. *See United Steelworkers of Am. v. Smoke–Craft, Inc.,* 652 F.2d 1356, 1360 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1718, 72 L.Ed.2d 139 (1982). This rule even extends to questions, such as arbitrator bias, that go to the very heart of arbitral fairness. *See Carr v. Pacific Maritime Ass'n,* 904 F.2d 1313, 1317 (9th Cir.1990) (plaintiffs' failure to exhaust grievance procedures not excused because of alleged lack of neutrality of arbitration), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co.,* 756 F.2d 742, 746 (9th Cir.1985) ("*Kinney*") (plaintiff not allowed to challenge composition of arbitration board unless plaintiff objected when they were seated); *Kodiak Oil Field Haulers, Inc. v. Teamsters Union Local No. 959,* 611 F.2d 1286, 1290 (9th Cir.1980) (plaintiff did not object to alleged bias of an arbitrator at the time Board of Arbitration was convened and thus, issue waived).

This rule applies when there is an objection to the adequacy or form of procedures used in commercial arbitration. *See Todd Shipyards Corp.,* 943 F.2d at 1063–64. It also applies when it is claimed that a labor arbitration was not fairly conducted. *See Kinney,* 756 F.2d at 746. It is no less applicable when the claim is phrased in terms of a violation of the duty of fair representation. *See Carr,* 904 F.2d at 1317.

■ Here, the major thrust of Marino's objection is his assertion that WGA precluded him from ascertaining the qualifications or partiality of the arbiters. The WGA's refusal to disclose the arbiters' identity was pursuant to the procedures which we have outlined. Under the procedures, "[a]s has always been [WGA] practice, the names of the arbiters selected remain confidential." CDP § D.1. WGA's confidentiality policy is "supported by important and legitimate considerations, including the necessity that arbitrators be entirely freed from both real and perceived dangers of pressure, retaliation, and litigation." *Ferguson v. Writers Guild of Am., W., Inc.,* 226 Cal.App.3d 1382, 1391, 277 Cal.Rptr. 450 (Cal. Ct.App.1991) (upholding WGA's confidentiality policy).

The procedures allow the participating writers to strike a reasonable number of names from the list of arbiters. The list is long, and if one did not have substantial familiarity with the writing community, it may be well nigh impossible to ferret out possible bias in all of the persons on it. Still, Marino, without objection, took advantage of that opportunity. Between him and Wright, 85 names were stricken. From the remaining names on the list, three arbiters were chosen. Each potential arbiter was screened for potential bias by an arbitration coordinator.

While the notion of an anonymous judge may jar those who are used to judicial proceedings, no doubt WGA and its members understand the practical difficulties involved in having the arbiters' names disclosed. Very important people may be unhappy with a decision and may be in a good position to pressure or take revenge against the arbiters. Moreover, the WGA and its members have decided that the best arbiters will be experienced working members of the screenwriters community. The heavy responsibility of the arbiter's mantle might well be declined by hard-working writers if they knew that they could be hauled through recriminatory judicial proceedings, accused of bias, and the like. The procedures that reflected and dealt with these concerns had existed for decades. They were grounded on the collective bargaining agreement and were designed to implement its terms. Presumably they were fair. *See Kinney,* 756 F.2d at 746.

In the face of this, Marino made no objection until the arbiters had found against him. Presumably the procedure was satisfactory to him, just as it was to the other members of the WGA. That is, it was satisfactory to him until the arbiters' decision went against him.

It is important to notice that Marino's attack on the anonymity of the arbiters, and the other concomitants of that anonymity, is very much like a claim of arbitrator bias. In fact, its central proposition is that the arbi-

ters might be biased against him but he cannot tell for sure because he does not know whom they are. Of course, he cannot know for sure whether they are biased or not because he has not had an opportunity to investigate or grill them on that issue. Nevertheless, the claim is a bias claim at root. We hold that this claim, like that of actual bias, was waived when Marino failed to protest the procedure before the arbiters were selected and performed their task. A claim of true bias can be considered and dealt with before individuals have invested their time and decided the case. So too could this claim have been taken account of. Here the individuals who were being asked to decide a knotty screen credit question with celerity and certainty could have been informed that their impartiality and qualifications were being challenged. The WGA could have taken steps to ameliorate *those* claims. Just as importantly, the prospective arbiters, once being made aware of the claims, could have decided that they did not wish to become a part of a process which is, as the Manual says, "arduous and unpleasant." Perhaps individuals who had no objection to disclosure of their names could be found. We do not know. What we do know is that this bias issue, like others, should have been raised before the arbiters acted, not after. We understand Marino's focus on what he perceives as an issue of fairness to himself. We, however, must focus on fairness to all involved, including the arbiters and all of the other union members and officers who have relied on the arbitration process for so long.

As we see it, Marino's complaint of his inability to have a face-to-face hearing before the arbiters, complete with cross-examination—issues also not raised before his loss—must fall with the anonymity claim. They are its accompaniments.

We hasten to add two additional thoughts. We recognize that it would be possible to create a procedure so palpably unfair on its face that no prior objection should be expected or required. An anonymous coin toss might be an example of that. On the record before us, that is *not* the procedure we are dealing with. While Marino focuses on the arbiters' phase of the process, he loses sight of the overall arbitration process itself. He

ignores the phase one evidentiary hearing process and likewise ignores the phase three procedural review process. The former, of course, provides for all of the usual confrontation and evidentiary rights. The latter provides some assurance of procedural fairness. Marino's claim that he is not in a position to assert procedural problems because he did not appear before the arbiters is not persuasive. He did assert problems. As we will soon discuss, they were dealt with. Also, while it is true that the arbiters could have failed to consider materials or proceeded to commit other wrongs in a hidden way, that could occur despite hearings and despite knowledge of the arbiters' identities. In effect, Marino's claims in this regard do, once again, come back to the single issue of arbiter anonymity.

In a similar vein, we do not hold that every possible endemic procedural defect must be raised in advance or waived. We need not, and should not, sweep that broadly. It may often be the case that a union member should simply go through the provided procedures, especially if no objection can possibly change them. *Cf. Carr*, 904 F.2d at 1317–18. In *Carr*, for example, the plaintiffs claimed that the grievance procedures were flawed because they did not provide for discovery or representation by counsel, among other things. There we said that "at a minimum" the plaintiffs should have presented and prosecuted their claims through the contractual procedures despite their assertions of inadequacy. *Id.* 904 F.2d at 1318. We did not decide whether a failure to object to those procedures in advance would have waived the claims. Similarly, we do not now decide that question, or others like it.

B. *Duty of Fair Representation; the Other Claims.*

■ In addition to his assault on the heartland of the arbitration procedure—anonymity—Marino has raised a number of other claims about the handling of the "Godfather III" proceeding. He asserts that in handling this proceeding, WGA breached its duty of fair representation.

"The undoubted broad authority of the union as exclusive bargaining agent in the

negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." *Humphrey v. Moore,* 375 U.S. 335, 342, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964). "Unions have broad discretion to act in what they perceive to be their members' best interests. This court has construed the unfair representation doctrine in a manner designed to protect that discretion." *Moore v. Bechtel Power Corp.,* 840 F.2d 634, 636 (9th Cir.1988) (citation omitted).

This court engages in a two-step analysis to determine whether a union has breached the duty of fair representation. First, we must decide whether the alleged union misconduct "involved the union's judgment, or whether it was 'procedural or ministerial.'" Second, if the conduct was procedural or ministerial, then the plaintiff may prevail if the union's conduct was arbitrary, discriminatory, or in bad faith. However, if the conduct involved the union's judgment, then "the plaintiff may prevail only if the union's conduct was discriminatory or in bad faith."

*Burkevich v. Air Line Pilots Ass'n, Int'l,* 894 F.2d 346, 349 (9th Cir.1990) (citations omitted); *Moore,* 840 F.2d at 636; *see also Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967) (to establish a breach of the duty of fair representation, a union member must show that the union's conduct towards him was "arbitrary, discriminatory, or in bad faith"). Mere negligence is not sufficient. To be arbitrary, "[t]he union must have acted in 'reckless disregard' of the [union member's] rights." *Moore,* 840 F.2d at 636. The union's duty of fair representation extends to its negotiation activities. *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, ——, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991).

Marino's claims raise a potpourri of fair representation issues, some of which relate to judgment and others of which are procedural in nature. All of them, he says, should result in the overturning of the arbitration award. We will consider each of them.

He begins by asserting that the whole procedure is fundamentally unfair. *See Sun-shine Mining Co.,* 823 F.2d at 1295. Of course, the adoption of procedures is a matter of judgment. For the most part, this is just another iteration of his waived complaint about arbiter anonymity. Thus, it must fail. He does, however, add yet another complaint. He says he was not given an opportunity to reply to the written statements of the other participating writers because he could not see those statements. The Manual does preclude that opportunity. *See* CDP § D.4(b). However, the statements are supposed to be just that—mere statements and not evidence. We see no fundamental unfairness. When time is of the essence, as it is in credit determinations, the receipt of simultaneous briefs is not a shocking development by any means. That certainly would justify the decision not to allow replies. We are somewhat more concerned about the requirement that the statements remain confidential; replies could be denied or discouraged, without that added stricture. However, it can hardly be said that this alone makes the procedure discriminatory or in bad faith. It is simply a part of an approach to speedy decision making that the writers have long since adopted. At any rate, Marino was given a copy of the Coppola and Puzo statement during discovery in the district court proceedings. His failure to bring any actual problems to that court's attention suggests that he did not suffer prejudice to a strong interest of a kind that can justify a determination that the duty of fair representation was breached. *See Moore,* 840 F.2d at 636.

Marino next claims that he was denied the right to have the identities of the writers remain anonymous. The Manual clearly provides that, upon request, the identities of all participating writers will be kept from the arbiters. CDP § D.3. He asserts that he demanded that right but was told by the Screen Credits Coordinator that he could not have anonymity. That, if so, would itself be a procedural violation. However, it was exactly the kind of issue that the third phase of the arbitration procedure was designed to deal with. Marino brought this problem to the attention of the PRB. That body did not ignore his claim. Rather, it appears that the PRB conducted an investigation and questioned the Arbitration Coordinator. It then

determined that Marino never requested an anonymous arbitration despite many opportunities to do so over a lengthy period. The PRB examined Marino's written statements submitted to the arbiters and noticed that Marino had included his own name. There was no evidence that Marino's materials included a statement that he was submitting his name under protest. The PRB then decided that his rights were not compromised.

Although there might have been a factual dispute as to whether Marino actually requested anonymity, the fact that a dispute exists does not establish that WGA's conduct was discriminatory or in bad faith. Nor, for that matter, does it indicate that it was arbitrary. *See Moore*, 840 F.2d at 637; *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916. In fact, it appears that the WGA considered Marino's complaint in a manner far from perfunctory. After investigating the allegation, it reached a reasoned conclusion. In sum, we see no grounds to overturn that arbitral decision. Similarly, to the extent it reflects an exercise of judgment by the WGA, we find no breach of the duty of fair representation.

Next, Marino asserts that he was prevented from submitting certain evidence that he deemed to be important—that is, his 1987 treatment. He says that he sought to have a phase one hearing on that subject but was denied it. He raised this issue before the PRB and it explained that because Marino "was not employed by a signatory company to write [the] treatment and it was not purchased or licensed by a signatory company," that treatment was not under the jurisdiction of the WGA. Given that, it said, the material could not be considered. Because those facts were admitted by Marino, there was no need to hold an evidentiary hearing regarding them.

Even if other interpretations of the collective bargaining agreement would have been plausible, there is nothing to indicate that this decision was discriminatory or made in bad faith. There is no indication that it was a recent or idiosyncratic interpretation designed for the purpose of injuring Marino. In short, the making of that decision does not show that the WGA violated its duty of fair representation.

Marino then claims that the arbiters failed to review the materials submitted to them, and reviewed materials not submitted to them. In particular, he says that the WGA should have ordered a new arbitration when it ascertained that (1) two of the arbiters did not read the literary material thoroughly, and (2) the arbiters considered the predecessor "Godfather" movies and Puzo's novel, "The Godfather." These contentions involve the exercise of the WGA's judgment, and, therefore, Marino must show that the WGA's decisions were made discriminatorily or in bad faith. *See Burkevich*, 894 F.2d at 349–50.

Two arbiters did indicate that they focused their attention mostly on the writings offered by Marino, Wright, Coppola, and Puzo, as opposed to the several other submissions from writers who were not seeking credit. They said they did so because these four were the only parties vying for screen credits. If anything, that would seem to inure to Marino's benefit. Certainly it does not establish that his work was glossed over. It is not at all apparent that he was prejudiced and he has not shown that he was. *See Moore*, 840 F.2d at 636 (union's conduct must prejudice a strong interest of the union member). Moreover, nothing in the record indicates that WGA's decision to accept the arbiters' award was discriminatory or in bad faith. *See Burkevich*, 894 F.2d at 352 (union's judgment call, even if poorly made, does not constitute breach of duty of fair representation). Marino also asserts that one arbiter at first failed to read his 1985 treatment. The PRB investigated this allegation, agreed with Marino, and corrected the problem. That does not smack of discrimination or bad faith; it tends to show that the process was working properly. *See Vaca*, 386 U.S. at 194, 87 S.Ct. at 919.

Finally, Marino states, the arbiters improperly considered *ex parte* evidence, specifically the predecessor "Godfather" movies and the book. Under the Procedures, "the Arbitration Committee bases its decision on the written scripts, including story and source material." CDP § D.3. According to WGA, "source material" includes material from the book and from the previous movies

to which "Godfather III" is the sequel. Moreover, Marino made references to the predecessor movies in his own written statement. One wonders how that really could be avoided. It appears disingenuous of him to contend now that the arbiters improperly considered that material. Again, no discrimination or bad faith is shown.

### C. *Discovery.*

Marino argues that the district court erred by denying his discovery request that the arbiters' identities be revealed. He asserts that identification was necessary if he was to determine whether the arbiters were properly qualified and whether they were biased or partial.

The district court committed no error. As we have already held, the arbiter anonymity issue has been waived. It cannot be resurrected through the use of a discovery order. That information, under the circumstances of this case, was not relevant. *See* Fed.R.Civ.P. 26(b).

### CONCLUSION

Movies are expensive creative works. Once they are ready for release their owners wish to move quickly. When the WGA wrested the unilateral power to decide screen credits from the producers, it did so at the price of an agreement that WGA itself would move quickly. The need for speed is part of the right it negotiated for on behalf of its members. That need drives the whole process; in the absence of quick determinations, it is likely that the right itself would wither away.

The procedures adopted by WGA were designed to make the difficult screen credit decision in a speedy and fair fashion. Although the three-phase arbitration procedure is not the same as the more deliberate judicial procedures that we are accustomed to, this case helps show why it cannot be. "Godfather III" was released over three years ago, and only now is the second phase of federal judicial procedures moving toward completion. That is not the fault of the

parties or of the judicial system. Our procedures require time; other needs demand other procedures.

On this record, and based upon the issues properly before us for decision, we cannot say that the procedures designed for speed overwhelmed the ideal of justice.

AFFIRMED.