Wendell WELLMAN, an Individual, Plaintiff–Appellant–Cross–Appellee,

and

Wendell Wellman Productions, a California Corporation, Plaintiff–Cross–Appellee,

v.

WRITERS GUILD OF AMERICA, WEST, INC., a California Corporation, Defendant–Appellee– Cross–Appellant.

Nos. 96–56549, 96–56601.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 1998.

Decided June 3, 1998.

Cynthia A. Vroom, Fox & Spillane, Los Angeles, California, for plaintiffs-appellants/cross-appellees.

Julius M. Reich, Reich, Adell, Crost & Cvitan, Los Angeles, California, for defendant-appellee/cross-appellant.

Before: PREGERSON, BEEZER, and HALL, Circuit Judges.

PREGERSON, Circuit Judge:

## OVERVIEW

Wendell Wellman appeals the district court's grant of summary judgment in favor of the Writers Guild of America (the "Guild") in Wellman's action seeking to obtain damages and to vacate an arbitration award. Guild arbiters awarded screenwriting credit for "Fair Game" to Charlie Fletcher, another screenwriter. Wellman argues that neither the arbiters nor the Guild's Policy Review Board (the "Board") followed Guild procedures. Wellman also contends that the district court erred when it determined that claims he failed to present to the Board were waived. Finally, Wellman argues that the district court erred by denying him a continuance pending discovery. The Guild cross-appeals the district court's denial of its motion for attorneys' fees against Wellman and his company, Wendell Wellman Productions. Additionally, the Guild moves for attorneys' fees on appeal. We affirm the decision of the district court, and we deny the Guild's motion for attorneys' fees on appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

In Hollywood, a screenwriter's name is his most coveted asset. Ordinarily, a writer who contributes to a script can expect to see his name in the credits of the film. When a film is nearly complete, its producer assesses each screenwriter's contribution to the final product and assigns film credits. Some screenwriters may receive several credits; others may receive none. The credit does not merely satisfy a writer's longing to see his name in lights; it can propel him to other work-perhaps to the next blockbuster.

When disputes between writers and producers arise, the antagonists turn to the Guild, which is a labor union and the screenwriters' collective bargaining representative in the motion picture industry. The Guild has adopted rules and policies to prevent studios and production companies from using their superior bargaining power to assign credit arbitrarily. The rules for determining how a writer can receive credit for his work on a motion picture script are set forth in "Theatrical Schedule A, Theatrical Credits" ("Schedule A"). Under Schedule A, any writer who helped write the screenplay is a "participating writer" who may receive one or more specific film credits.

Wellman was one of many screenwriters who contributed to the chain of materials that culminated in "Fair Game," a motion picture produced by Warner Brothers ("Warner"). Initially, Warner refused to designate Wellman as a participating writer on the screenplay for "Fair Game." Because Schedule A is part of the collective bargaining agreement, it only grants participating writers the right to invoke the Guild's arbitration procedure to protest the producer's allocation of credit. Without rights under the collective bargaining agreement, Wellman's only recourse was to file a lawsuit against Warner.

On July 31, 1995, Wellman filed suit in a California court, and Warner removed the suit to the federal district court. One month later, Warner issued a Revised Notice of

Tentative Credits ("Revised Notice") for the film. The Revised Notice listed Wellman as a participating writer, but Wellman still was unhappy with Warner's apportionment of writing credit. Specifically, Wellman could not persuade Warner to give him screenplay credit. Instead, Warner insisted that another screenwriter, Charlie Fletcher, was entitled to sole credit for the screenplay of "Fair Game." Wellman's new status as a participating writer triggered his rights and obligations under Schedule A, requiring him to resolve his grievance through Guild arbitration. The district court dismissed Wellman's lawsuit against Warner without prejudice.

Schedule A does not describe the arbitration procedures in detail. Instead, the Guild's Screen Credits Manual contains two other documents that provide specific guidance to the parties, the arbiters, and the reviewing Board: the Credit Determination Procedure and the Guild Policy on Credits. Following the procedures set forth in the Credit Determination Procedure, Wellman filed a timely protest with the Guild on September 8, 1995. The essence of Wellman's grievance was that he deserved a share of writing credit for the screenplay.[1]

A few days later, the Guild notified all of the participating writers named in the Revised Notice that an expedited arbitration would be held to determine the writing credits for "Fair Game." The notice required Wellman and the other participating writers to file a statement with the Arbitration Committee describing their writing contributions and the credits that those contributions deserved. Pursuant to the Credit Determination Procedure, three professional screenwriters were appointed as arbiters. On September 21, 1995, the arbiters were given statements by four screenwriters (including Wellman) who had worked on the adaptation of "Fair Game" for film, the screenwriters' drafts of the screenplay,[2] and a copy of a continuity script.[3] When the arbitration was concluded on September 26, 1995, the arbiters agreed with Warner that Wellman's work on the project merited no screenplay credit.

Wellman requested that the Board conduct a review of the arbitration on September 27, 1995. Wellman's petition to the Board alleged that the arbiters could not have had sufficient time to analyze all the submitted material; that Warner delayed providing the final continuity script; that Warner failed to designate the final shooting script in a timely fashion; and that Wellman was delayed in providing his statement to the arbiters. On October 2, 1995, the Board conducted a hearing in which the parties participated. Approximately two hours after the meeting, the Board informed Wellman that it would affirm the arbiters' decision.[4]

Convinced that the Board had not conducted a meaningful review, Wellman filed a complaint against the Guild in the United States

1. According to the Guild Policy on Credits, no writer is entitled to screenplay credit for an adaptation of existing material unless his work represented a contribution of more than 33% of the final script. Except under unusual circumstances, this means that no more than two writers may be given screenplay credit. Warner's determination that only Fletcher deserved screenplay credit indicated that, in its estimation, Wellman's contributions did not exceed one-third of the screenplay.

2. The Guild presented each of the arbiters a copy of the novel "Fair Game" on September 15, 1995. The participating writers all assented to this unusual move because it gave the arbiters a head start on the arbitration, an attractive innovation in light of the expedited circumstances of the arbitration.

3. Under less frenzied circumstances, the arbiters would have been given a copy of Warner's final shooting script. But Warner had not completed a final script by the time the arbitration began; instead, it was shooting the remaining scenes of "Fair Game" from what is known in the industry as a continuity script. A continuity script reflects last-minute changes and cuts that producers authorize in the final stages of a film shoot.

The arbiters and the participating writers all received copies of a "final" continuity script on the day that the arbitration began. But because the continuity script is by nature a changeable thing, Warner was busy revising it throughout the week of the arbitration. Accordingly, Warner arranged to deliver the pages of the continuity script to the Guild as revisions were made. As it received the pages, the Guild passed them along to the arbiters and to the participating writers.

4. On November 3, 1995, the Board memorialized its conclusions in a written opinion.

District Court on April 2, 1996, alleging several violations of Section 301 of the Labor Management Relations Act ("LMRA"). Wellman also alleged that the Guild had breached Schedule A by deviating from established procedures during the "Fair Game" arbitration, thereby depriving Wellman of a fair arbitration. Specifically, Wellman argued that the arbiters could not have reviewed the voluminous amount of material in the short time that they allegedly did; that the Board did not investigate sufficiently whether the arbiters carried out their duties; that the Guild did not provide Wellman with a final shooting script, as was required by Schedule A; that the Guild intentionally understated to Wellman the number of scripts that those vying for screenwriting credit could submit to the arbiters;[5] and that the Guild improperly allowed Fletcher to be represented by one of the Guild's attorneys.

On July 5, 1996, the Guild moved for summary judgment. The district court granted summary judgment to the Guild on August 28, 1996, but denied the Guild's request for attorneys' fees. Specifically, the district court concluded that the Guild had not breached its duty of fair representation when it investigated Wellman's claims that the arbiters had insufficient time to review the submitted material; that the Board spent insufficient time investigating how much material the arbiters read; and that Wellman never was given a final shooting script. The district court held that Wellman's claim about Fletcher's representation by a Guild lawyer was waived because Wellman did not raise it before the Board. For the same reason, the court held that Wellman had waived his claim that he was allowed to submit fewer scripts than Fletcher.

Wellman timely filed this appeal. The Guild cross-appealed, seeking review of the district court's denial of its request for attorneys' fees. The Guild also requests attorneys' fees on appeal.

### Jurisdiction and Standard of Review

The district court had jurisdiction over the original matter under 28 U.S.C. § 1331. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

■ We review a district court's grant of summary judgment de novo. *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997). We must determine, considering the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

### Wellman's Appeal

#### A. Duty of Fair Representation

■ We determine whether the Guild has breached its duty of fair representation by applying a two-step analysis:

First, we must decide whether the alleged union misconduct involved the union's judgment, or whether it was procedural or ministerial. Second, if the conduct was procedural or ministerial, then the plaintiff may prevail if the union's conduct was arbitrary, discriminatory, or in bad faith. However, if the conduct involved the union's judgment, then the plaintiff may prevail only if the union's conduct was discriminatory or in bad faith.

*Marino v. Writers Guild of America, East, Inc.,* 992 F.2d 1480, 1486 (9th Cir.1993) (quoting *Burkevich v. Air Line Pilots Ass'n, Int'l,* 894 F.2d 346, 349 (9th Cir.1990)) (internal quotation marks omitted). Thus, as a threshold matter, we must determine whether the Guild's error involved a ministerial or judgmental act.

■ We have noted that "differentiating a ministerial task from a judgment call is not always easily accomplished." *Peters v. Burlington N. R.R. Co.,* 931 F.2d 534, 539 (9th Cir.1990). In our review of Wellman's claims, we are mindful that

the labels "ministerial act" and "act of judgment" represent not absolute categories without relation to one another but

---

5. Wellman alleges that the arbiters reviewed nearly a dozen of Fletcher's scripts, whereas they only reviewed one of Wellman's submissions.

This fact remains in dispute. The Guild contends that it provided only two of Fletcher's scripts to the arbiters.

opposing points on a continuum that broadly attempts to separate discretionary decision making from inexplicable conduct. At one end of this continuum are procedural imperatives over which a union rarely agonizes by virtue of the fact that they do not necessitate the exercise of much judgment. At the other end are actual, rational attempts on the part of a union to properly interpret a collective bargaining agreement or otherwise handle a grievance.

*Id.* at 539–40. Union actions that are commanded or prohibited by union rules or policies involve little or no discretion and generally are ministerial in nature. *See, e.g., Stevens v. Moore Business Forms, Inc.,* 18 F.3d 1443, 1448 (9th Cir.1994) (citing the timely filing of a meritorious grievance as an example of ministerial conduct); *Moore v. Bechtel Power Corp.,* 840 F.2d 634, 637 (9th Cir.1988) (holding that a union's failure to provide adequate notice of grievance meetings, its failure to abide by time limits at meetings, and its tardy announcement of its decision were ministerial conduct); *Dutrisac v. Caterpillar Tractor Co.,* 749 F.2d 1270, 1274 (9th Cir.1983) (holding that a union's failure to perform the "mechanical function" of attending to deadlines is ministerial conduct). On the other hand, when a union is confronted with more subjective issues about which the collective bargaining agreement or union policies are silent, and which are sufficiently novel that no practices have developed to cope with them, we are more likely to find a union's judgment at work. *See Moore,* 840 F.2d at 637 (holding that a union's consistent construction of its collective bargaining agreement adversely to the union member was a matter of judgment).

■ A union's decision not to arbitrate a grievance that it considers to be meritless is an exercise of its judgment. *Stevens,* 18 F.3d at 1447. And, in general, a union's decision about how best to handle a grievance also is a matter of its judgment. *Peterson v. Kennedy,* 771 F.2d 1244, 1254 (9th Cir.1985). But to be sure that the union is employing some principled way of screening the meritorious grievances from the meritless ones, we have held that "a union must conduct some minimal investigation of grievances brought to its attention." *Tenorio v. NLRB,* 680 F.2d 598, 601 (9th Cir.1982). Consequently, when a union member brings a meritorious grievance, the union's decision to ignore that grievance or to process it in a perfunctory manner is a ministerial action that we will overturn if it is arbitrary, discriminatory, or performed in bad faith. *Peters,* 931 F.2d at 539–40. But we will not find that the union has exercised its duties perfunctorily unless it has treated the union member's claim so lightly as to suggest an "egregious disregard" of her rights. *Stevens,* 18 F.3d at 1448 (citing *Tenorio,* 680 F.2d at 601).

**1. The Thoroughness of the Arbiters' Review**

Wellman argues that the arbiters failed to give the materials submitted to them a meaningful review. Specifically, Wellman maintains that the arbiters could not have read all the materials that the Guild supplied them in the four-day period in which they deliberated.

■ Wellman misapprehends the scope of judicial review in cases involving arbitration conducted pursuant to Schedule A and the Guild's Screen Credits Manual. Where, as here, the Board has reviewed a writer's complaints regarding the adequacy of the arbiters' consideration of the materials provided them, we review only the Board's decision. *See* 29 U.S.C. § 185(a); *Marino,* 992 F.2d at 1486–87. Under these circumstances, we do not review directly the actions of the arbiters. *See id.* Accordingly, we hold that Wellman's various allegations about the actions of the arbiters raise an issue only of the adequacy of the Board's decision to affirm the arbiters' judgment.

■ To prevail on this issue, Wellman must demonstrate that the Board's conduct was arbitrary, discriminatory, or undertaken in bad faith. *See id.* at 1486 (quoting *Burkevich,* 894 F.2d at 349). Our threshold inquiry is whether the Board's conduct in this case was ministerial or involved the exercise of the Board's judgment. *See id.* As a preliminary matter, we note that Wellman is not

contending that the Board's actions deviated from the terms of the collective bargaining agreement or the policies adopted to implement it.[6] Instead, Wellman argues that the Board's review of his claim was so perfunctory as to be ministerial, pointing to the fact that the Board reached its decision in only two hours.

We disagree with Wellman's assumption that the Board could not have conducted a diligent review of the arbiters' judgment in that span of time. Guild policies and procedures circumscribe the Board's review of the arbiters' credit determination. The Credit Determination Procedure prohibits the board from reviewing any materials that were available to the arbiters. The Board may consider only whether the arbitration was marred by undue influence on the arbiters or whether the arbiters' award reflects a dereliction of duty or a misinterpretation, misapplication, or violation of Guild policy. Significantly, the Board "is not empowered to reverse the decision of an Arbitration Committee in matters of judgment." The Board reasonably could have concluded that how closely the arbiters read the materials was a matter of judgment. Under this construction of the Credit Determination Procedure, the Board need not have spent much time investigating this claim: it could not have second-guessed the arbiters' judgment anyway. Where, as here, the resolution of a union member's grievance turns on the union's rational interpretation of its written policies, further investigation is unnecessary. *Evangelista v. Inlandboatmen's Union*, 777 F.2d 1390, 1396 (9th Cir.1985).

Wellman argues further that the Board acted discriminatorily or in bad faith in determining that the arbiters' review of the materials did not constitute a dereliction of duty within the meaning of the Credit Determination Procedure. The Board rejected Wellman's argument that the arbiters were required to evaluate the screenplays by breaking down the novel "Fair Game" structurally, as the writers had done in creating their scripts. The Board determined that the Arbitration Committee is not required to perform a structural breakdown of a novel when determining screenwriting credit. The Board relied instead on its own practical familiarity with the arbiters' duties, and upon its common-sense understanding that writing a script is very different from reading one.

We find nothing discriminatory in this exercise of the Board's judgment. It is unavoidable, even desirable, that arbiters "draw from their personal knowledge of the workplace and the relevant industry when they make their awards." *Stead Motors v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1207 (9th Cir.1989) (en banc). Because "the practices of the industry ... [are] equally a part of the collective bargaining agreement although not expressed in it," *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), we assume that the Board-which is charged with measuring the arbiters' conduct against the rules and procedures that implement the collective bargaining agreement-will resort to its knowledge of the industry when *reviewing* arbitration awards.

In sum, Wellman has adduced no evidence tending to show that the Board conducted a discriminatory or bad faith investigation of the depth and attention that the arbiters paid to their task. The district court's decision to enforce the Board's decision therefore was correct.

### 2. The Final Shooting Script

■ Wellman contends that he never received a final shooting script for "Fair Game" and that this omission was a bad-faith departure from the procedures specified in the Screen Credits Manual. Both Schedule A and the Credit Determination Procedure required Warner to send a "copy of the final shooting script (or if such script is not available, the latest revised script available) ... to each of the participating writers." It is undisputed that Warner had not completed-and therefore, could not have provided to the

---

6. Nor do Guild policies offer any support for such a claim. Guild rules only establish the *maximum* time that the entire arbitration process may consume, requiring that the entire process be completed within twenty-one business days. *See id.* Those rules do not determine the *minimum* amount of time that the Board must spend investigating a claim.

parties-its final shooting script by the time the arbitration began. Therefore, we must determine whether the Guild's decision to commence the arbitration without a final script constituted a breach of its duty of fair representation. *See Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). Once again, we begin our inquiry by determining whether the Guild's decision to proceed with the expedited arbitration was an exercise in judgment or a ministerial act.

We conclude that the Guild made a judgment call. The terms of Schedule A do not tell the Guild what to do when-as in this case-*neither* a final nor a revised shooting script exists at the time of the arbitration. Warner was shooting from a continuity script that reflected up-to-the-minute cutting and revisions. The Credit Determination Procedure states that "the Guild has the right to ask for a cutting continuity [script] which will be provided by the Company if it is available at the time of the arbitration." The Guild so requested, and Warner complied. To account for the fact that the continuity script was changing daily, the Guild allowed Warner to submit to the arbiters piecemeal any additional changes made to the continuity script. Because Guild rules or policies provided no clear guidance in this situation, we conclude that the Guild exercised its judgment.[7]

We are not persuaded that the Guild exercised its judgment discriminatorily or in bad faith. Even though no rule or policy obliged the Guild to do so, it gave Wellman and the other screenwriters the pieces of the continuity script as the arbiters received them and allowed the writers to revise their statements in light of the changes that Warner had made. To prevent any screenwriter from turning this gesture to unfair advantage, the Guild made these pages available to all of the writers simultaneously. The Guild's willingness to bend its rules in the screenwriters' favor is inconsistent with Wellman's allegation that it acted in bad faith. That the Guild bent its rules even-handedly contradicts Wellman's claim that it acted discriminatorily. For these reasons, the Guild's failure to provide Wellman with a final shooting script did not violate the Guild's duty of fair representation.

## B. Waiver

■ Wellman also contends that the Guild acted discriminatorily or in bad faith by permitting Fletcher to be represented by a Guild attorney, and by submitting to the arbiters more of Fletcher's scripts than Wellman's scripts. The district court held that Wellman waived these issues by failing to raise them before the board. We agree with the district court.

■ "[I]t is well settled that a party may not sit idle through an arbitration proceeding and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse." *Marino,* 992 F.2d at 1484. Wellman had notice of both of the issues he raises here before the board rendered its final decision. The Guild asserts, and Wellman does not dispute, that the Board could have and would have heard these claims had Wellman raised them. In light of that undisputed fact, Well-

---

**7.** The fact that the arbitration commenced without a final shooting script has as much to do with Wellman's choices as it does with any judgment that the Guild made. For example, Guild policy cautions screenwriters to refrain from invoking arbitration procedures until they have read a final shooting script. The Credit Determination Procedure states:

> If after reading the final script the writer wishes to protest, he/she sends the following telegram both to the Company and to the Guild:
>
> "HAVE READ FINAL SCRIPT AND HEREBY PROTEST TENTATIVE CREDITS ON (NAME OF PRODUCTION) AND CONSIDER CREDIT SHOULD BE _____."

Credit Determination Procedure § B.3. A writer's familiarity with the final script is not an absolute precondition to arbitration, but "[t]he Guild feels strongly that no member should request credit or ask for an arbitration without first having read the material." *Id.* Wellman ignored this advice when he sought arbitration. Additionally, Wellman demonstrated the same impatience throughout the arbitration. Although the proceeding could have been postponed pending the Guild's receipt of a finished continuity script, Wellman specifically requested that his arbitration not be delayed pending receipt of a completed continuity script.

man's assertion that the Guild's procedures could not adequately resolve these claims is purely conjectural. Challenges to untested procedures are "entirely speculative," and we will not entertain them. *See Carr v. Pacific Maritime Ass'n,* 904 F.2d 1313, 1319 (9th Cir.1990). Therefore, the district court did not err in holding these claims waived.

### C. Denial of a Continuance Pending Discovery

Wellman contends that the district court erred when it denied his motion for a continuance pending discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Wellman argues that the district court should have given him time to have an expert evaluate whether the arbiters could have read all the relevant material in such a short time.

■ We review the district court's discovery rulings for an abuse of discretion. *Amarel v. Connell,* 102 F.3d 1494, 1515 (9th Cir.1996). Rule 56(f) requires Wellman to show that additional discovery would uncover specific facts that would preclude summary judgment. *Maljack Prods., Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 888 (9th Cir.1996).

■ We hold that the district court did not abuse its discretion. The court denied Wellman's discovery request because it believed that expert testimony was neither necessary nor relevant to this issue. Because lay jurors could determine how much the arbiters could read in a given period without the assistance of an expert, the district court did not err when it determined that such testimony was unnecessary to Wellman's case. Additionally, Wellman did not explain how the information he sought would preclude summary judgment. Even if discovery revealed that the arbiters could not have conducted their review in the manner that Wellman believes they should have, he has pointed to no Guild rule *requiring* that the arbiters peruse the materials in any particular way. Accordingly, we hold that the district court did not abuse its discretion when it denied Wellman's Rule 56(f) motion.

### The Guild's Cross–Appeal

The Guild cross-appeals the district court's denial of its motion for attorneys' fees, contending that the district court committed clear error when it determined that Wellman had not pursued his claims against the Guild in bad faith. Characterizing Wellman's appeal as frivolous, the Guild also requests attorneys' fees on appeal.

■ A prevailing party may receive attorneys' fees if his adversary "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Sheet Metal Workers v. Madison Indus. Inc.,* 84 F.3d 1186, 1192 (9th Cir.1996) (citation and quotation marks omitted). We must affirm the district court's finding that Wellman did not act in bad faith, unless that finding was clearly erroneous. *Id.* If that finding is not clearly erroneous, then we review the district court's denial of attorneys' fees for abuse of discretion. *Id.*

■ Our review of the record convinces us that the district court committed no clear error when it determined that Wellman did not act in bad faith. Although it is true that the district court dismissed without prejudice a very similar suit that Wellman filed against *Warner,* the mere resemblance of that complaint to the pleading that Wellman filed against *the Guild* does not, without more, suggest bad faith. Because different defendants and different facts were involved in Wellman's successive lawsuits, the identical pleading could have obtained quite different results. Furthermore, in the face of unresolved disagreement about how many scripts Wellman had reason to believe were sent to the arbiters, the district court's rejection of the conclusion that Wellman's counsel fabricated this issue was not clearly erroneous. We conclude that the court did not abuse its discretion in declining to award the Guild attorneys' fees.

■ Nor do we award the Guild its attorneys' fees on appeal. An appeal is only considered frivolous if "the result is obvious or the arguments of error advanced are wholly without merit." *International Union of Petroleum and Indus. Workers v. Western Indus. Maint. Inc.,* 707 F.2d 425, 430 (9th Cir.1983) (citations omitted). Although Well-

man's claims were not meritorious, neither were they frivolous. In these circumstances, we will not grant the Guild attorneys' fees on appeal.

## CONCLUSION

For the reasons stated above, we affirm the district court's order in its entirety. We deny the Guild's motion for attorneys' fees on appeal.

AFFIRMED.