**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOUSTON MARITIME ASSOCIATION, Inc., and Master Stevedore Association of Texas, and International Longshoremen's Association, Independent, Local No. 1273, Respondents.**

No. 20552.

United States Court of Appeals Fifth Circuit.

Sept. 29, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen.

**334**

Counsel, Nancy M. Sherman, Atty., Arnold Ordman, Gen. Counsel, Elliott Moore, Attorney, N.L.R.B., Washington, D.C., for petitioner.

Robert Eikel, Houston, Tex., for Houston Maritime Ass'n., Inc., and Master Stevedores Ass'n. of Texas.

Chris Dixie, Dixie & Schulman, Marion C. Ladwig, James P. Wolf, Houston, Tex., for Local 1273.

Before HUTCHESON and RIVES, Circuit Judges, and GROOMS, District Judge.

RIVES, Circuit Judge.

The Board petitions for enforcement of its supplemental decision and order dated April 20, 1962, reported at 136 N.L.R.B. 1222. The Board's initial decision and order dated August 8, 1958, reported at 121 N.L.R.B. 389, were on the docket of this Court in 1961 and, with leave, the petition for enforcement was withdrawn to permit the Board to consider the effect of three opinions rendered by the Supreme Court on April 17, 1961.[1]

The employers, Houston Maritime Association, Inc., and Master Stevedore Association of Texas, are stevedores; that is, they contract with vessel operators to load or unload ships. They represent 41 member companies. Each of the employers was party to a separate, but identical, bargaining agreement with the Union, International Longshoremen's Association and several of its affiliated locals, including Local 1273. The agreement required the employers to obtain longshoremen through Local 1273's hiring hall. The Board found that the employers violated section 8(a) (1), (2) and (3) of the Labor Management Relations Act[2] by engaging in employment practices which gave preference to union members; and, in view of the preferential operation of the hiring hall, by acquiescing in a practice which required nonmembers to pay Local 1273 a percentage of their wages as a condition of employment, and by requiring all applicants for employment as longshoremen to designate Local 1273 as their bargaining agent and to agree to be bound by union laws and regulations. The Board further found that the employers discriminated against five individual nonunion longshoremen, at Local 1273's request, because the Local believed that they were engaging in rival union activity. In addition, the Board found that the employers violated section 8(a) (2) of the Act by permitting supervisors to hold responsible office in Local 1273.

The Board also found that Local 1273 violated section 8(b) (1) (A) and 8(b) (2) of the Act[3] by causing the employers' unlawful discrimination, and by partici-

---

1. Local 60, United Brotherhood of Carpenters, etc. v. National Labor Relations Board, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed. 2d 1; Local 357, International Brotherhood of Teamsters, etc. v. National Labor Relations Board, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11; and National Labor Relations Board v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29.

2. In pertinent part:
"§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *
"(3) by discrimination in regard to hire or tenure of employment or any term or
condition of employment to encourage or discourage membership in any labor organization * * *." 29 U.S.C.A.
Section 157 provides in pertinent part:
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except * * *." 29 U.S.C.A.

3. "(b) It shall be an unfair labor practice for a labor organization or its agents—
"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with re-

pating in the practice of requiring non-union longshoremen to pay percentages, and all longshoremen to designate Local 1273 as their bargaining representative and to agree to be bound by union laws, as a condition of employment.

The Board's order requires the employers and the union to cease and desist from the unfair labor practices found, to make three of the nonunion longshoremen whole for any loss of pay they may have suffered by reason of the discrimination against them,[4] to give written notice to employee Garza that upon application he will be employed without discrimination, and to reimburse nonunion workers the percentages of their wages paid by them to the union.[5]

In Local 357, International Brotherhood of Teamsters, etc. v. National Labor Relations Board, supra, n. 1, the Supreme Court held that an agreement which required employers to employ casual employees, both union members and nonunion members, through a hiring hall operated by the union is not unlawful per se, but that the Board is confined to determining whether discrimination has in fact been practiced. To like effect is National Labor Relations Board v. News Syndicate Co., supra, n. 1.

The union insists that there is no substantial evidence that it accorded preference in selection and assignment of longshoremen *on the basis of union membership*.

spect to the acquisition or retention of membership therein * * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *." 29 U.S.C.A. § 158(b) (1) (A) and (2).

4. The other two had already been made whole in the course of settlement negotiations.

The method of selection of longshoremen was for the employer to call the business agent of Local 1273 and advise him of the necessary details. The business agent then chose the gang foremen from the group theretofore selected by the Local and wrote their names in chalk on a blackboard in the union hall. The gang foremen then selected from among the men present the number of longshoremen called for. The union does not deny that substantial evidence established that in most cases union members were selected first, and if they were unavailable, then nonunion men. Nor does the union dispute that union members were given preference for "key jobs." [6] The union insists, however, that union members were thus preferred not on the basis of their membership, but because they were more experienced and capable than nonmembers. The union membership was restricted to about 400 longshoremen. Between 1952 and 1955, the union accepted no new members. No more than half of the rank-and-file longshoreman jobs were filled by union members. Some of the nonunion men had worked through the hall for as long as fifteen years. In this field, the Trial Examiner and the Board were presumably better equipped or informed by experience than is this Court. We cannot say the Board's choice of view, that the preference in employment to union members was on account of their membership, was unreasonable or not sustained by substantial evidence.[7]

5. The union's brief asserts that, "The *principal problem in this case is the re-imbursement order* which counsel estimates to amount to possibly $600,000.00."

6. "Key jobs" consist of jobs which require less manual labor than others, or are performed under more comfortable circumstances. The ship's hold reaches a temperature of 120 degrees in the summer.

7. See Universal Camera Corporation v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L. Ed. 456; N. L. R. B. v. Coats & Clark, Inc., 5 Cir. 1956, 231 F.2d 567, 572.

The employers insist that they are not responsible for the discriminatory acts which took place at the hiring hall, because the actual hiring was done by the employer's walking foreman at shipside. Actually, the walking foremen usually accepted the first longshoremen sent through the union hall. In any event, they could not rectify discriminatory practices followed at the hiring hall, because the bargaining agreement permitted them to substitute only longshoremen who had likewise been sent out through the hiring hall. The union was the employers' hiring agent to such an extent that the employers are responsible for the hiring practices of the union of which the employers either knew, or by reasonable diligence should have known.[8]

The other findings of fact of the trial examiner adopted by the Board are sustained by substantial evidence on the record as a whole. We agree also with the Board's supplemental decision and order except that part which orders that the respondents, jointly and severally, reimburse all nonmember employees for all percentages exacted, beginning six months prior to the filing of the charge herein.

All employees, union and nonunion, were required to turn over a percentage of their pay (at first 5 per cent, but later reduced to 3 per cent) as charges for the union's referral services. The Trial Examiner and the Board found no sufficient evidence in the record to warrant a finding of actual disparity in the amounts paid by the two groups of employees. There is no evidence in the record as to the actual cost of operating the hiring hall, and no showing or finding that the percentages charged were excessive.

The hiring hall arrangement was not unlawful per se.[9] Reasonable and nondiscriminatory charges for the union's referral services were legal.[10]

The Board's Supplemental Decision and Order states:

" * * * The Trial Examiner concluded that there was insufficient evidence in the record to warrant a finding of actual disparity in the amounts paid by the two groups of employees. Accordingly, he recommended dismissal of this allegation of the complaint. Chairman McCulloch would adopt this finding of the Trial Examiner for the reasons stated in the Intermediate Report. In light of the illegal discriminatory practices found above, Members Rodgers and Leedom find that the requirement that all employees pay a percentage of their wages as a condition of employment was a discriminatory exaction which tended to encourage the nonmembers to join the union and members to remain members, and hence was unlawful.

"Member Fanning and Brown believe that a distinction exists here in the treatment of union and nonunion job applicants. It is one thing to charge job applicants a reasonable fee for referral services in the operation of an exclusive hiring hall arrangement. It is quite another thing, as Respondents did here, to require nonunion applicants to pay a service or referral fee for the privilege of taking their place at the bottom of the referral list because they lacked union membership. Thus to favor union applicants with resulting prejudice to nonunion applicants is plainly discriminatory, and

8. See N. L. R. B. v. Southern Stevedoring & Contracting Co., 5 Cir. 1964, 332 F. 2d 1017, 1019.

9. Local 357, International Board of Teamsters, etc. v. National Labor Relations Board, supra, n. 1.

10. Local 357, International Board of Teamsters, etc. v. National Labor Relations Board, supra, n. 1; National Labor Relations Board v. News Syndicate Co., supra n. 1; Local 1351, Steamship Clerks & Checkers, etc. v. N. L. R. B., 1964, 117 U.S.App.D.C. 304, 329 F.2d 259; Galveston Maritime Association, 1962, 139 N.L. R.B. 352.

Members Fanning and Brown join Members Leedom and Rodgers in holding that Respondents respectively violated the Act by exacting a service fee from nonunion applicants as a condition of employment and then treating them as second-rate citizens for referral purposes."

█ The illegal discriminatory practices to which Members Rodgers and Leedom referred appear to have been the requiring of individual designations of the union as bargaining agent and requiring all employees, members and nonmembers, to agree to be bound by union laws and regulations. If those practices are considered separately from the requirement of charges for the union's referral services, it is plain that the reimbursement order bears no rational relationship to the correction of those illegal practices. We would agree with Members Fanning and Brown that a distinction exists in the treatment of union and nonunion job applicants. There was substantial evidence that nonunion men were discriminated against and union men were preferred in selection for jobs and in assignment to jobs. Again, however, if such discrimination is considered separately from the requirement of charges for the union's referral services, the reimbursement order bears no rational relation to the correction of the discrimination. Indeed, the nonunion men who have the largest earnings and have been discriminated against least would get the largest refunds, while those not employed at all and discriminated against the most would get no refund whatever. The less the discrimination against an individual, the more he would receive in refunds. In these circumstances, reimbursing all nonunion employees for all

percentages exacted is not "a reasonable attempt to put aright matters the unfair labor practice set awry." [11] The order of reimbursement would require the employers to pay again moneys already paid once to the nonunion employees or would deprive the union of all charges, reasonable or otherwise, for its referral services to nonunion longshoremen. Such an order is punitive and not remedial or reasonably designed to effectuate the purposes of the Act.[12]

The enforcement of Paragraph 3(b) [13] of the Order is therefore denied. In all other respects the order is enforced.

Denied in part and enforced in part.

11. From the concurring opinion of Mr. Justice Harlan in Local 60, United Brotherhood of Carpenters, etc. v. National Labor Relations Board, supra, n. 1, 365 U.S. at 658, 81 S.Ct. at 879.

12. See the cases cited in footnote 10, supra.

13. "3. The Respondents, Houston Maritime Associations, Inc., and Master Stevedore Association of Texas, their officers,

agents, successors and assigns, and International Longhoremen's Association, Independent, Local No. 1273, its officers, agents, and representatives, shall:

\*      \*      \*      \*      \*

"(b) Jointly and severally reimburse all employees for monies illegally exacted from them in the manner and to the extent set forth above."