**REVISED OCTOBER 13, 2016**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-60073

United States Court of Appeals
Fifth Circuit

**FILED**
September 29, 2016

Lyle W. Cayce
Clerk

PATRICK SIMMS,

    Plaintiff - Appellant

v.

LOCAL 1752, INTERNATIONAL LONGSHOREMEN ASSOCIATION,

    Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, SMITH, and COSTA, Circuit Judges.

KING, Circuit Judge:

Patrick Simms, who is not a union member, was denied referral for employment because he refused to pay a fee to use the union's hiring hall. The district court dismissed his suit asserting that the fee was unlawful. We find no error and AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As alleged in the complaint, CSA Equipment Company, LLC ("CSA") and Defendant–Appellee International Longshoremen Association Local 1752 ("Local 1752") are parties to a collective bargaining agreement, and as part of

this agreement, CSA must hire all of its clerks and other employees through the hiring hall operated by Local 1752. "[A]s a condition of obtaining employment through [Local 1752's] hiring hall," an individual must either be a union member or pay a "service fee." CSA assists in the collection of this fee by deducting the amount due from the employee's paycheck if the employee signs a checkoff authorization card.

Plaintiff–Appellant Patrick Simms works for CSA primarily as a clerk in charge and, therefore, is required to use Local 1752's hiring hall. Simms is not a member of Local 1752 and did not make the required payments to Local 1752 for use of its hiring hall. Local 1752 sent Simms a letter stating, in part, that "to be in good standing [Simms] must either pay Hiring Hall fees or be a dues paying member of one of the Locals," and since Simms was not a union member, he "must make some arrangement with the Hiring Hall and the Locals to pay the Hiring Hall fees related to being referred for work." If Simms failed to pay the fees, the letter stated that he would "no longer be able to be referred for hire through the Hiring Hall."

Simms did not make the required payments, and on May 1, 2015, according to Simms's complaint, "Local 1752 caused CSA to not employ Simms." In other words, Simms would no longer be referred for employment with CSA through the hiring hall. Ten days later, however, Simms "sign[ed] under protest" an agreement with Local 1752 to pay in installments the delinquent fees, allowing him to be referred through the hiring hall once again.

On October 8, 2015, Simms filed suit against Local 1752 asserting that it breached its duty of fair representation; its assessment of mandatory fees to Simms, a non-union member, for using the hiring hall was prohibited by Mississippi's right to work law; and the payment agreement was void as against public policy for those reasons. On January 8, 2016, the district court granted Local 1752's motion to dismiss. The court held that Simms's

2

allegations were insufficient to state a claim for breach of the duty of fair representation, and that Mississippi's right to work law was preempted by federal law "with respect to the issue of requiring non-members to pay hiring hall fees." The court further held that Simms's claim that the payment agreement he had reached with the union was void as against public policy was not cognizable because the relevant Mississippi law was preempted by federal law. Simms timely appealed.

## II. STANDARD OF REVIEW

This court reviews "a district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6) de novo" and "accept[s] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *New Orleans City v. Ambac Assurance Corp.*, 815 F.3d 196, 199–200 (5th Cir. 2016) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). "Dismissal is appropriate when the plaintiff has not alleged 'enough facts to state a claim to relief that is plausible on its face' and has failed to 'raise a right to relief above the speculative level.'" *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

## III. MISSISSIPPI'S RIGHT TO WORK LAW

We first turn to Simms's primary argument that section 14(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 164(b), allows enforcement of Mississippi's right to work law, Miss. Code Ann. § 71-1-47,[1] thereby

---

[1] While Local 1752 argued in the district court that Mississippi's right to work law did not apply to hiring hall fees regardless of federal preemption, Local 1752 does not make this argument on appeal. Section 71-1-47 states, *inter alia*, the following:

(a) Any agreement or combination between any employer and any labor union or labor organization whereby any person not a member of such union or organization shall be denied the right to work for an employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an

precluding the assessment of hiring hall fees to Simms. "[I]n passing the NLRA Congress largely displaced state regulation of industrial relations," and thus, states "may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986) (citing *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959)). Section 14(b), however, provides a limited exception:

> Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b). According to Simms, Local 1752's requirement that he pay fees for obtaining referrals through the hiring hall amounts to compulsory union "membership" under section 14(b), and therefore, Mississippi can prohibit those fees via its right to work law. Local 1752, however, contends that section 14(b) does not apply, and Mississippi's right to work law is therefore preempted under these circumstances.

---

employment monopoly in any enterprise, is hereby declared to be an illegal combination or conspiracy and against public policy.

(b) No person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer.

. . .

(d) No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees, or other charges of any kind to any labor union or labor organization.

(e) Any person who may be denied employment or be deprived of continuation of his employment in violation of any paragraph of this section shall be entitled to recover from such employer and from any other person, firm, corporation, or association acting in concert with him, by appropriate action in the courts of this state, such actual damages as he may have sustained by reason of such denial or deprivation of employment.

Miss. Code Ann. § 71-1-47.

At the outset, it is important to describe clearly the scope of several allegations in the complaint. First, the only fees at issue are fees assessed to Simms, a non-union member, for obtaining referrals through Local 1752's exclusive hiring hall. Second, Simms does not allege that these fees were unreasonable or excessive relative to the costs of operating the hiring hall. Instead, Simms's argument is that, regardless of the amount, all hiring hall fees can be prohibited by a state right to work law because payment of those fees amounts to union "membership" under section 14(b).

This argument hinges on Simms's interpretation of how the hiring hall fees at issue here fit within two provisions of the NLRA, sections 8(a)(3) and 14(b), which were first added to the NLRA by the Taft-Hartley Act in 1947.[2] It is instructive first to review the historical context of the relevant aspects of the Taft-Hartley Act. *See Commc'ns Workers v. Beck*, 487 U.S. 735, 747 (1988) ("[T]he structure and purpose of § 8(a)(3) are best understood in light of the statute's historical origins."). Prior to the Taft-Hartley Act, section 8(a)(3) of the NLRA permitted closed shop, union shop, and agency shop agreements. *Oil, Chem. & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 414 (1976). Generally speaking, a closed shop is a type of union-security agreement that requires prospective employees to become union members before commencing employment. *Id.* at 409 n.1. In contrast, a union shop, which requires employees to join the union after being hired, and an agency shop, which requires employees to make payments to the union after being hired but not to join the union, are less stringent types of union-security agreements. *See id.* "By 1947, [closed shops] had come under increasing attack," and Congress determined that they should be banned. *Beck*, 487 U.S. at 748. That

---

[2] Labor Management Relations (Taft-Hartley) Act, ch. 120, sec. 101, §§ 8(a)(3), 14(b), 61 Stat. 136, 140–41, 151 (1947) (codified at 29 U.S.C. §§ 158(a)(3), 164(b)).

being said, Congress also recognized that prohibiting closed shops could create a free rider problem—*i.e.*, employees choosing not to contribute financially to the union but still benefiting from the union's actions. *See id.*

Against this historical backdrop, section 8(a)(3) of the Taft-Hartley Act attempted to accomplish the "twin purposes" of eliminating "the most serious abuses of compulsory unionism . . . by abolishing the closed shop" but still allowing certain union-security agreements to counter the free rider problem. *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 740–41 (1963). Specifically, section 8(a)(3) "makes it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization.'" *Beck*, 487 U.S. at 744 (quoting 29 U.S.C. § 158(a)(3)). While this would appear to bar any union-security agreement, section 8(a)(3) also contains a proviso that allows unions to require "membership" as a condition of employment thirty days after the beginning of employment so long as the following safeguards are met:

> [N]o employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . .

29 U.S.C. § 158(a)(3); *see also Beck*, 487 U.S. at 744–45. "Taken as a whole, § 8(a)(3) permits an employer and union to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the 'membership' that may be so required has been 'whittled down to its financial core.'" *Beck*, 487 U.S. at 744–45 (footnote omitted) (quoting *Gen. Motors*, 373 U.S. at 742).

"While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, § 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy." *Oil, Chem. & Atomic Workers*, 426 U.S. at 416–17. As explained by the Supreme Court, section 14(b) "was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements. And it was the proviso to § 8(a)(3), expressly permitting agreements conditioning employment upon membership in a labor union, which Congress feared might have this result." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 373 U.S. 746, 751 (1963) (footnote omitted); *see also Laborers' Int'l Union, Local No. 107 v. Kunco, Inc.*, 472 F.2d 456, 458 (8th Cir. 1973) ("This statute can best be described as an exception to the general rule that the federal government has preempted the field of labor relations regulation."). However, "[s]ince § 8(a)(3) already prohibits the closed shop, the more restrictive policies that § 14(b) allows the States to enact relate not to the hiring process but rather to conditions that would come into effect only *after* an individual is hired." *Oil, Chem. & Atomic Workers*, 426 U.S. at 417.

With this statutory framework in mind, we turn to the primary issue in this case and conclude that section 14(b) does not allow Mississippi to prohibit unions from requiring non-union members to pay a hiring hall fee. Therefore, Mississippi's right to work law, Miss. Code Ann. § 71-1-47, is preempted by federal law to the extent that it prohibits non-union members from being required to pay hiring hall fees. We further agree with the district court that this ruling does not invalidate Mississippi's right to work law in its entirety, but rather only insofar as it could be interpreted as prohibiting unions from requiring non-union members to pay a hiring hall fee.

For nearly 70 years after the NLRA was amended by the Taft-Hartley Act, courts have consistently treated hiring halls as being distinct from union-

security agreements generally. An exclusive hiring hall is not per se illegal under the NLRA, and it only becomes illegal if it operates in a discriminatory manner. *See Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 673–74 (1961). While the existence of an exclusive hiring hall may encourage union membership, section 8(a)(3) "does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited." *Id.* at 674–76 (quoting *Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 42–43 (1954)).

Moreover, it is settled law that hiring halls can require non-union members to pay a reasonable fee related to the costs of operating the hiring hall. *See, e.g.*, *Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 657 (D.C. Cir. 1992) ("Congress, the Supreme Court, and the NLRB thus agreed on the basic principles of a legitimate hiring hall for which nonunion workers could be charged a fee by the union . . . ."); *NLRB v. Hous. Maritime Ass'n*, 337 F.2d 333, 336 (5th Cir. 1964) ("Reasonable and nondiscriminatory charges for the union's referral services were legal.").[3] This stands in contrast to union-security agreements, which constitute illegal discrimination under the NLRA unless they satisfy section 8(a)(3)'s proviso. *See Beck*, 487 U.S. at 744 ("[Section 8(a)(3)] contains two provisos without which all union-security clauses would fall within this otherwise broad condemnation . . . .").

And this distinction makes sense. Hiring halls serve a unique purpose, one in which the union can act as an employment agency or referral system for the employer, benefiting all of the parties involved. *See Pittsburgh Press*, 977 F.2d at 657 (comparing the original hiring hall with its modern day attributes);

---

[3] Conversely, an unreasonable or excessive hiring hall fee assessed to non-union members can constitute an unfair labor practice. *See, e.g.*, *NLRB v. Local 138, Int'l Union of Operating Eng'rs*, 385 F.2d 874, 877–78 (2d Cir. 1967).

*Local 357*, 365 U.S. at 673–74 ("Senator Taft made clear his views that hiring halls are useful, that they are not illegal per se, that unions should be able to operate them so long as they are not used to create a closed shop . . . ."). For example, as part of a hiring hall, "[a] union may . . . employ its facilities, its phone lines, its network for identifying and recruiting workers, its judgment and expertise in matching a worker's skills with a particular job, or its members' time and effort in building and maintaining a job referral system." *Pittsburgh Press*, 977 F.2d at 661. This distinction is why, unlike a union-security agreement, no court that we are aware of, and Simms has pointed to none, has held that referral fees assessed to non-union members for use of a hiring hall can be prohibited under a state right to work law. Put another way, while a union-security agreement can amount to union "membership" under section 14(b), requiring a non-union member to pay a reasonable referral fee for the use of an exclusive hiring hall does not.

Indeed, more than fifty years ago this court held that section 14(b) does not apply to hiring halls. *NLRB v. Hous. Chapter, Associated Gen. Contractors, Inc.*, 349 F.2d 449, 453 (5th Cir. 1965) ("[T]he long and short of the matter is that § 14(b) contemplates only those forms of union security which are the practical equivalent of compulsory unionism."); *see also Kunco*, 472 F.2d at 458–59; *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 771 (9th Cir. 1965). Contrary to Simms's position, assessing a fee to non-union members for use of a hiring hall does not distinguish the instant case from this precedent. It is settled law that, under the NLRA, exclusive hiring halls can assess non-union members a reasonable fee for the costs of operating the hiring hall. Such a fee does not constitute union "membership" under section 14(b), and this conclusion is reinforced by the fact that this fee relates to pre-hire rather than post-hire conduct. *See Oil, Chem., & Atomic Workers*, 426 U.S. at 417 ("It is evident, then, that § 14(b)'s primary concern is with state regulation of the

*post*-hiring employer-employee-union relationship."); *see also Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing and Pipefitting Indus. v. NLRB*, 675 F.2d 1257, 1262 (D.C. Cir. 1982) ("Use of a hiring hall precedes hiring, and therefore does not constitute 'membership' under § 14(b)."). We reject Simms's contention that the fact that the fees here were supposed to be collected at a later date via deductions from Simms's paycheck (rather than prior to the referral) transforms this into post-hire conduct.

Simms points to *Beck* in support of his argument that the mandatory payment of any fee to a union constitutes "membership" for the purposes of sections 8(a)(3) and 14(b). By this reasoning, Simms concludes that the hiring hall fee assessed in the instant case is either illegal under the NLRA or allowed under section 8(a)(3)'s proviso and, therefore, can be banned under Mississippi's right to work law. But *Beck* does not support this argument.[4] *Beck* concerned a union-security agreement—not a hiring hall—and these are treated distinctly under the NLRA.[5] As discussed above, unions may require non-union members to pay a reasonable fee for the use of an exclusive hiring hall without violating the NLRA. Simply put, *Beck* does not dictate that the hiring hall fees assessed to Simms amount to union "membership" under section 14(b).

---

[4] Taking Simms's argument to its logical conclusion, if a hiring hall fee were required to satisfy section 8(a)(3)'s proviso to be lawful, then a hiring hall fee assessed at the time of referral would not be lawful under the NLRA. Part of the proviso mandates that union "membership" must not be required until at least 30 days after employment, which would be violated by a hiring hall fee that is assessed when the employee is first referred. In other words, Simms's argument would in effect treat hiring halls that charge non-union members a reasonable fee the same as closed shops, which is not the case under the NLRA.

[5] For similar reasons, Simms's reliance on *Sweeney v. Pence*, 767 F.3d 654 (7th Cir. 2014), is misplaced.

## IV. THE DUTY OF FAIR REPRESENTATION

Simms also fails to allege sufficient facts to state a cognizable claim for breach of the duty of fair representation. Under the NLRA, unions have a duty of fair representation "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 73 (1989) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). This duty extends to exclusive hiring halls and is violated when a union's actions are "arbitrary, discriminatory, or taken in bad faith." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 388 (2d Cir. 2015) (citing *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991)); *see also Milright & Mach. Erectors, Local Union 720 v. NLRB*, 798 F.2d 781, 784 (5th Cir. 1986) ("We have interpreted the duty of fair representation to mean that a union operating an exclusive hiring hall 'may not apply arbitrary or invidious criteria in referring employees to jobs.'" (quoting *Int'l Union of Operating Eng'rs Local 406 v. NLRB*, 701 F.2d 504, 508 (5th Cir. 1983))).[6]

Simms, however, does not allege any conduct by Local 1752 that was arbitrary, discriminatory, or done in bad faith. Simms's only allegation on this point can be summarized as the following: he has to pay fees to Local 1752 for use of its hiring hall, and if he does not pay those fees, the hiring hall will stop referring him and he will not be able to obtain employment with CSA. This allegation, however, is insufficient to state a claim for breach of the duty of fair

---

[6] Because Simms has only alleged that the mere fact that a fee was assessed to non-union members was a breach of the duty of fair representation, we need not address whether exclusive hiring halls require a heightened duty of fair representation. *See Bowerman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 646 F.3d 360, 368–69 (6th Cir. 2011) (discussing how the Ninth and D.C. Circuits have applied a heightened standard to hiring halls but that a previous panel on the Sixth Circuit had not). Simms would also fail to allege a cognizable claim under a heightened standard.

representation. As discussed above, an exclusive hiring hall can legally require non-union members to pay a reasonable fee, *see, e.g.*, *Pittsburgh Press*, 977 F.2d at 657. Simms does not allege that the amount of the fee was unreasonable, relying instead only on the fact that a fee was assessed at all. Nor does Simms make any other relevant allegations about the hiring hall's criteria or procedures. Simms's argument that any hiring hall fee assessed to non-union members breaches the duty of fair representation is contrary to settled law, and once again, his reliance on *Beck* is unavailing given that *Beck* did not concern a hiring hall.[7]

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[7] Simms does not otherwise advance an argument on appeal that the payment agreement he reached with Local 1752 was void as against public policy. Even if he did, we agree with the district court that this claim is not cognizable given that Simms cannot state a claim under Mississippi law based on the required fees at issue here.